IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EDWARD and PAMELA PRUNCKUN, as parents and legal guardians of ROBERT PRUNCKUN, | § § § § | No. 93, 2018C |
| Plaintiffs-Below, Appellants, | § § § | On appeal from the Superior Court of the State of Delaware |
| v. | § § § | C.A. No. N16A-05-010 |
| DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES, | § § § | |
| Defendant-Below, Appellee. | § § § | |

_____

| | | |
|---|---|---|
| MALCOLM and DOMINICA OLDHAM, as parents and legal guardians of ASHLEE OLDHAM, | § § § § | No. 94, 2018C |
| Plaintiffs-Below, Appellants, | § § § | On appeal from the Superior Court of the State of Delaware |
| v. | § § § | C.A. No. N16A-05-009 |
| DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES | § § § | |
| Defendant-Below, Appellee. | § § § | |

Submitted:  November 28, 2018
Decided:    January 3, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc.*

Upon appeal from the Superior Court.  **AFFIRMED**.

Francis G.X. Pileggi, Esquire, Brian D. Ahern, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware.  Of Counsel: Michael P. Flammia, Esquire, Eckert Seamans Cherin & Mellott, LLC, Boston, Massachusetts; Christopher E. Torkelson, Esquire (*Argued)*, Eckert Seamans Cherin & Mellott, LLC, Princeton, New Jersey, for Appellant.

Lauren E. Maguire, Esquire (*Argued)*, Adria B. Martinelli, Esquire, Delaware Department of Justice, Wilmington, Delaware, for Appellee.

**VALIHURA**, Justice:

## I.    Overview

Ashlee Oldham ("Ashlee") and Robert Prunckun ("Robert") (collectively, "Recipients") are the only two Delaware Medicaid recipients housed at Judge Rotenberg Center ("JRC"), a facility in Massachusetts and the only facility in the United States known to use a skin-shocking device, namely a graduated electronic decelerator ("GED"), on its residents.[1]  GED delivers an electric current to an individual's skin, producing a voltage of 66v through the skin.  Side effects, aside from the shock, include reddening of the skin, potentially lasting for days, blisters, and anxiety.  For years since the mid-2000s, while at JRC, Recipients' comprehensive behavioral treatment plans included GED and these services were covered by Medicaid with the knowledge and approval of Delaware's Department of Health and Social Services ("DHSS").

But in 2012, the Center for Medicare and Medicaid Services ("CMS"), the federal agency charged with promulgation and enforcement of Medicaid regulations and the approval of certain waivers relevant here, advised the Massachusetts state agency responsible for Medicaid administration that continued use of GED by JRC would place that state's waiver program in jeopardy of losing federal funding.  That waiver is part of a program Congress has authorized in order for certain persons with developmental disabilities to receive Medicaid services in a community setting, rather than in an

---

[1] Although these are two separate appeals, the legal arguments presented in Appellants' separate opening briefs are identical.  The State has filed nearly identical briefs in the two appeals.  This Court, *sua sponte*, consolidated the appeals.

institutional facility. It is known as the Home and Community Based Services ("HCBS") waiver program and it has provided such services to Recipients at issue here. Before a state can participate in the HCBS waiver program, it must first apply for a waiver from CMS. Thus, the use of GED by JRC threatened Massachusetts' waiver program.

Following CMS's letter to Massachusetts, Delaware took measures to avoid placing its own HCBS waiver program at risk. In October 2013, Delaware, through DHSS, instructed JRC to cease using GED on the Recipients. It sought and received clarification from Delaware's own CMS region that the use of GED was prohibited. DHSS finally terminated JRC as a qualified provider after JRC refused to cease using GED. According to DHSS, both federal and state entities charged with enforcing Medicaid laws have deemed the use of GED unacceptable in the HCBS community-based context and generally unacceptable in modern day society.

Although the procedural history is complex, as explained below, the gist of Appellants' challenge on appeal is that they were denied due process because Delaware's administrative hearing officer bifurcated proceedings to address what she concluded was a threshold issue, namely, whether GED is a covered Medicaid service under the Medicaid Home and Community Based Waiver ("HCBS Waiver") program. Instead, Recipients contend that they should have been allowed to introduce evidence that GED is medically necessary, and that by removing GED services, DHSS has threatened Recipients' ability to remain in a community-based setting—a conclusion they desired to prove through evidence and expert testimony. Accordingly, Recipients, by and through their parents and guardians ("Guardians") (collectively, "Appellants"), appeal from a January 15, 2016

4

decision (the "Final Decision") of Delaware's Medicaid Fair Hearing Officer ("Hearing Officer"). Appellants contend that the Hearing Officer violated their due process rights in bifurcating the Fair Hearing and in concluding that aversive treatment was no longer a "covered" service under Delaware's Medicaid waiver program.

Pending this appeal, as a result of transition agreements entered into by the parties, Recipients continue to receive community-based services, including the availability of GED, at JRC to this day.[2] CMS has prohibited the use of federal funding to JRC, and although the State of Delaware thereafter picked up the tab, it ceased making payments to JRC in 2014 after Delaware's contract with JRC expired.[3] But the State of Delaware agreed to pay JRC in full once the Recipients' transition out of JRC is complete.

## II.    Facts and Procedural Background

Recipients are adult Medicaid beneficiaries and Delaware citizens with uniquely severe, behavioral, developmental, and emotional disorders, disabilities, and autism. They both require intensive behavioral health services in order to treat their violent, self-injurious, and potentially life-threatening conditions. Both received medical assistance benefits pursuant to the Delaware Home and Community Based Services Medicaid Waiver ("HCBS Waiver"), a Medicaid option available to states under Section 1915(c) of the

---

[2] *See* App. to Opening Br. at A782–83 (No. 93). Appellants state that Ashlee no longer receives GED applications. *See* Reply Br. at 18, n. 4 (No. 93).

[3] The Hearing Officer's Final Decision states that "[s]ince CMS has prohibited JRC from receiving any federal funding as long as GED is in effect, DDDS is using state funds until the transition to a qualified Delaware provider is complete." App. to Opening Br. at A956.

Social Security Act (the "Act").[4] HCBS waivers allow states to offer services to individuals who are elderly or have disabilities and live in a community setting in lieu of institutionalization. In Delaware, the Division of Developmental Disabilities Services ("DDDS"), a division within Delaware's Department of Health and Human Services ("DHSS"), administers Delaware's HCBS Waiver program.

The Recipients are adult males and both have extensively documented histories of self-injurious, aggressive, and destructive behavior. For example, Robert's behavior included throwing chairs, destroying property, kicking and biting others, smearing his feces, urinating on the floor and in electrical outlets, banging his head on objects, refusing medical care, and jumping out of a second story window twice, which caused severe orthopedic injuries, including a broken pelvis. He has been diagnosed with intermittent explosive disorder, impulse control disorder, pervasive developmental disorder, and personality change secondary to brain injury.

Ashlee's behavior included banging his head, causing severe head injury, self-induced vomiting, dangerous weight loss, biting others, kicking and spitting, scratching and biting himself, inappropriate urination and defecation, refusing medical care, and violently attacking staff. When he was enrolled in the Delaware's Autism Program, twenty workers' compensation claims were filed by staff members injured by Ashlee's unpredictable lunging and biting—all within a fifteen-month period.

---

[4] 42 U.S.C. § 1396n(c) (2018).

After a long history of unsuccessful treatment and institutionalization for their severe behaviors and disabilities, both Ashlee and Robert, in 2004 and 2005, respectively, entered the JRC in Massachusetts where they remain. It is one of the few facilities in the country to employ aversive treatment procedures. JRC is the only facility in the United States that utilizes a graduated electronic decelerator device.

A Probate and Family Court in Massachusetts, in considering Robert's Proposed Medical Behavior Modification Treatment Plan dated June 11, 2013, explained that JRC uses the Graduated Electronic Decelerator 4 device ("GED-4"), which is manufactured by JRC. That device "consists of a transmitter operated by the JRC staff, a battery-operated receiver/stimulator worn by the JRC client and an electrode that is connected to the receiver/stimulator by a cable."[5] The receiver/stimulator delivers a two-second "low-level surface application of electrical current to the client's skin upon command from the transmitter."[6] The GED-4 "produces a current of 41 mA RMS, with a voltage of 66v when applied to typical skin resistance of 1.6 kilohms."[7] "One or more electrical stimulations, (depending on the client's particular treatment program) are administered to the client after he engages in a targeted behavior."[8] The side effects include reddening of the skin, blisters, and anxiety "during the brief period of time between the point in time when the teacher or

---

[5] App. to Opening Br. at A188 (No. 93).

[6] *Id.*

[7] *Id.*

[8] *Id.*

aide announces that the client has engaged in a targeted inappropriate behavior and the point at which the skin shock is administered."[9]

Appellants maintain that as a result of their ongoing treatment at JRC, the Recipients no longer require any restraint, and have avoided highly restrictive institutional or isolated settings and debilitatingly high dosages of psychotropic drugs that once were the norm for them. They point out that the use of GED is part of their individualized treatment plans approved by a Massachusetts Probate and Family Court judge who issued orders on their plans following an evidentiary process. They also point out that until 2013, DHSS assented to the Recipients' treatment plans at JRC. Although Appellants claim the aversive treatment has been the most successful thus far, it is, by far, the most controversial. As the State aptly observed, this case is largely about the use of GED, and changes to the federal and state rules that have impacted the issue of whether GED is an acceptable and appropriate treatment modality. That leads us to explaining the relevant regulatory and legal backdrop, and the evolving views of GED and aversive treatment as reflected in the Medicaid regulatory system.

*Overview of the Medicaid Waiver Program*

Both sides appear to acknowledge that federal and state standards have evolved over time in response to clinical practice and societal norms. But they disagree as to whether certain of these regulatory changes actually prohibited GED, whether those various regulatory changes and pronouncements have the force and effect of law, what deference

---

[9] *Id.* at A189. Ashlee's treatment program, including GED, was also approved by the Massachusetts Probate and Family Court. *Id.* at A42–43 (Sept. 13, 2013 Order).

they deserve by hearing officers and courts, and whether Appellants were given proper notice of them. One of the issues we have to unravel concerns Appellants' contention that when the State of Delaware sent letters to JRC in October 2013 demanding discontinuation of certain aversive treatments, including GED, that demand was based upon correspondence from the federal government sent to Massachusetts, which is Region I, not Region III, which encompasses Delaware. Appellants contend that correspondence did not prohibit GED in that it did not have the force of law, was not sent to the Guardians, and that by the time Delaware explicitly did prohibit GED, Appellants had already asserted their right to a Fair Hearing. Accordingly, Appellants contend the regulatory changes were a *post hoc* manufactured litigation maneuver targeting them, as opposed to a generalized prohibition, and as such, violated their due process rights.

DHSS responds that the 2013 CMS correspondence did prohibit GED, and in any event, Appellants are not prejudiced because Recipients presently continue to have the controversial GED treatment available to them at Delaware's eventual expense by virtue of transition agreements entered into between DDDS and the Guardians on April 28, 2015. DHSS further contends that by the time of the Fair Hearing, the prohibition at both the federal and state levels had become clear if it was not before, and so it made sense to determine, as a threshold matter, whether GED is now a covered Medicaid service.

By way of regulatory background, under the Medicaid regime, states and CMS enter a contract called the State Medicaid Plan. CMS is the federal agency charged with promulgation and enforcement of Medicaid regulations. Region I of CMS included Massachusetts and the JRC. Delaware is in Region III. Under a state's Medicaid Plan, the

9

state must provide all federally mandated Medicaid services, as well as any optional services it elects to cover at its discretion. Both the mandatory and optional components comprise the state's Medicaid Plan. CMS funds a percentage of the costs. In return for federal funds, the state must comply with requirements imposed by Title XIX of the Act.[10] CMS will not fund or reimburse a state for prohibited services. In Delaware, the Medicaid program is generally overseen by DHSS. DHSS contends GED is now a prohibited service.

CMS has the authority to waive certain provisions of the Medicaid laws.[11] The HCBS Waiver is a Medicaid option available to states under Section 1915(c) of the Act.[12] Nearly all states, including Delaware, offer services to persons with intellectual and developmental disabilities through a Section 1915(c) HCBS Waiver. This allows such persons to live in a community setting in lieu of institutionalization. The DDDS administers Delaware's HCBS Waiver.

The HCB Setting Rule sets forth requirements governing the criteria and characteristics of settings eligible for reimbursement for home and community-based services provided under Sections 1915(c), 1915(i), and 1915(k) of the Medicaid statute. The HCB Setting Rule defines person-centered planning requirements for individuals in Medicaid-funded community settings under HCBS Waivers. The rule seeks to ensure

---

[10] *See* 42 U.S.C. § 1396 (2014); 42 U.S.C. § 1396r (2011).

[11] Specifically, under § 1915(c) of the Act, the Secretary of the Department of Health and Human Services is authorized to waive § 1902(a)(10)(B) of the Act, allowing States to target an HCBS waiver program to a specified Medicaid-eligible group of individuals who would otherwise require institutional care.

[12] *See* 42 U.S.C. § 1396n (c).

individual rights of privacy, dignity, respect, and freedom from coercion and restraint in home and community-based settings. The State has argued that the move to eliminate electric shock as a covered Medicaid service began in 2010 with the passage of the Affordable Care Act[13] and the Setting Rules proposed and promulgated thereunder.[14] On April 15, 2011, CMS published proposed HCB Setting Regulations.[15] CMS published the proposed HCB Setting Regulations again on May 3, 2012.[16]

The HCB Setting Rule was published as a final regulation on January 16, 2014.[17] It became effective on March 17, 2014 and, consistent with the May 2012 proposed version, it bans the use of *coercion and restraint* in community settings. The final HCB Setting Rule provides in relevant part:

> Home and community based settings must have all of the following qualities, and such other qualities as the Secretary determines to be appropriate, based on the needs of the individuals indicated in their person-centered service plan:
> . . .

---

[13] Affordable Care Act: Patients Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 (codified as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152).

[14] App. to Opening Br. at A1035 (No. 93).

[15] Medicaid Program; Home and Community-Based Services (HCBS) Waivers, 76 Fed. Reg. 21311 (proposed Apr. 15, 2011) (to be codified at 42 C.F.R. pt. 441).

[16] Medicaid Program; State Plan Home and Community-Based Services, 5-Year Period for Waivers, Provider Payment Reassignment, and Setting Requirements for Community First Choice, 77 Fed. Reg. 26362 (proposed May 3, 2012) (to be codified at 42 C.F.R. pts. 430, 431, 435, 436, 440, 441, 447).

[17] Medicaid Program; State Plan Home and Community-Based Services, 5-Year Period for Waivers; Provider Payment Reassignment, and Home and Community-Based Setting Requirements for Community First Choice and Home and Community-Based Services (HCBS) Waivers, 79 Fed. Reg. 2948, 3032 (Jan. 16, 2014); 42 C.F.R. § 441.530(a)(1)(iii) (2014).

Ensures an individual's rights of privacy, dignity and respect, and freedom from *coercion and restraint*.[18]

The adoption of the HCBS Setting Rule was preceded by a lengthy public comment process.[19]

The DDDS waiver was set for renewal in 2014 in Delaware. In its revised waiver application submitted to CMS in March 2014, DHSS inserted a provision in its Waiver application explicitly stating that "*[t]he use of averse conditioning defined as the contingent application of startling, painful or noxious stimuli is prohibited.*"[20] On April 1, 2014, Delaware's Medicaid division published notice of the waiver in the Delaware Registry as a proposed regulation.[21] A public comment period of thirty days followed. Delaware's HCBS Waiver was published in the June 2014 Delaware Registry as a final regulation.[22]

---

[18] 42 C.F.R. § 441.530(a)(1)(iii) (emphasis added). This provision appeared in the May 3, 2012 version of the proposed rule. Medicaid Program; State Plan Home and Community-Based Services, 5-Year Period for Waivers, Provider Payment Reassignment, and Setting Requirement for Community First Choice, 77 Fed. Reg. 26362, 26378-79 (proposed May 3, 2012) (to be codified at 42 C.F.R. pts. 430, 431, 435, 436, 440, 441, 447).

[19] Medicaid Program, 77 Fed. Reg. at 26382-83 (describing the public comment process up to and including the 2012 proposed rule). The summary of the 2014 final HCBS Setting Rule states that 1,653 comments were received in response to publication of the April 15, 2011 proposed rule, and 401 timely comments were received "from state agencies, advocacy groups, health care providers, employers, health insurers, health care associations, and the general public" in response to the May 3, 2012 proposed rule. Medicaid Program; State Plan Home and Community-Based Services, 5-Year Period for Waivers, Provider Payment Reassignment, and Home and Community-Based Setting Requirements for Community First Choice and Home and Community-Based Services (HCBS) Waivers, 79 Fed. Reg. 2948, 2949, 2952, 3003 (Jan. 16, 2014) (to be codified at 42 C.F.R. pts. 430, 431, 435, 436, 440, 441, 447).

[20] App. to Opening Br. at A670 (No. 93) (emphasis added).

[21] 17 Del. Reg. 950 (Apr. 2014).

[22] 17 Del. Reg. 1179 (June 2014).

DDDS also published notice of the Delaware HCBS Waiver renewal application on its website.[23] Public meetings were held on March 4, 5, and 6, 2014 in each of the three counties. A written summary of the proposed changes (the same document available on the DDDS website) was provided to the public at the meetings, and the complete waiver application was available for public view. The Delaware HCBS Waiver was approved by CMS and became effective July 1, 2014.[24]

On October 7, 2015, DDDS amended its policies to incorporate the definition of "aversive" developed and adopted by the National Association of State Directors of Developmental Disabilities Services ("NASDDDS"). This revised Delaware Behavior and Support Plan prohibits a number of practices, including Averse Interventions.[25] The definition of "Averse Interventions" is:

> Interventions intended to inflict pain, discomfort and/or social humiliation or any intervention as perceived by the person to inflict pain, discomfort, or social humiliation in order to reduce behavior. Examples of aversive interventions include, but are not limited to, *electric skin shock*, liquid spray to one's face and strong, non-preferred tastes applied in the mouth.[26]

DHSS contends that there is also a contract-based prohibition on the use of GED. By contract with DDDS, all Delaware-qualified Medicaid providers who serve individuals

---

[23] App. to Opening Br. at A402 (No. 93).

[24] *See* State of Delaware: Statewide Transition Plan for Compliance with Home and Community-Based Setting Rule at 14, 39 (last updated Mar. 30, 2016), http:/dhss.delaware.gov/dhss/dmma/files/statewidetransitionplan.pdf.

[25] App. to Answering Br. at B2 (No. 93). Delaware's HCBS Waiver also bans the use of corporal punishment. *See* App. to Opening Br. at A499 (No. 93) ("DDDS Policy on Behavior and/or Mental Health support policy prohibits the use of mechanical restraints; corporal punishment or threat of corporal punishment . . . .").

[26] App. to Answering Br. at B4 (No. 93) (emphasis added).

through DDDS programming agree to comply with all statutes, regulations, policies and procedures of DDDS.[27] In DDDS's contract with JRC, JRC agreed to comply with "all State and Federal licensing standards and all other applicable standards as required to provide services under this Contract."[28] DDDS's contract with JRC expired on September 30, 2014, when JRC refused to cease use of GED on Recipients.[29]

*Overview of the Procedural Backdrop*

It is against the evolving regulatory framework that we consider the issues raised here. Although Appellants largely base their due process challenge on alleged flaws in the administrative process, in the end, both the Hearing Officer and the Superior Court viewed the principal and threshold issue as an issue of Medicaid coverage, and specifically, whether GED aversive treatment is a covered Medicaid service.

The most direct impetus for changes in Delaware's HCBS Waiver leading to the prohibition on GED treatment appears to stem from correspondence sent to Massachusetts by the federal government in 2012. On December 14, 2012, Richard McGreal, a CMS Associate Regional I Administrator, issued a letter to the Secretary of Massachusetts' Office of Health and Human Services ("Region I Letter") enclosing a draft report assessing Massachusetts' HCBS Waiver. The Region I Letter stated in relevant part:

> Residential and service settings operated by the Judge Rotenberg Educational Center (JRC) are of particular concern. The State indicated that JRC is the only provider currently using Level III interventions, described in the September 14th response letter as, "painful, aversive stimuli and deprivation

---

[27] App. to Opening Br. at A121 (No. 93).

[28] *Id.* at A109.

[29] DDDS last renewed the contract with JRC on July 1, 2013.

14

procedures." Level III interventions include use of an electronic shock device known as a graduated electronic decelerator, or GED, in use solely by JRC. . . .

Residential facilities and the use of aversive interventions including GED and the use of food deprivation procedures are regulated by the State. The State has described its movement toward positive behavioral reinforcement processes. However, as reasonable people will agree that electronic shock and withholding of meals have no place in their homes or communities, we therefore request that the State provide immediate assurance that the use of Level III aversive interventions have been eliminated for any and all individuals enrolled in the HCBS waiver. . . . At a minimum, the settings in which waiver participants are served must not include any in which State regulation authorizes the use of Level III interventions. This condition must be met no later than the effective date of the waiver renewal. In the interim the State should cease all billing for FFP for HCBS services provided to individuals residing in residences practicing these procedures.[30]

In light of the CMS directive to Massachusetts, and in preparation for its application to CMS for its own HCBS Waiver set for renewal in 2014, DDDS met with the Guardians to explain that JRC would no longer be permitted to use GED on the Recipients.[31]

---

[30] App. to Opening Br. at A812–13 (No. 93). Level III intervention is defined in Massachusetts' state regulations, in relevant part, as "[a]ny Intervention which involves the contingent application of physical contact aversive stimuli such as spanking, slapping, hitting or contingent skin shock." 115 CMR 5.14 (3)(d)(1). Delaware's HCBS waiver also bans the use of corporal punishment. *See* App. to Opening Br. at A499–500; *see also Judge Rotenberg Educ. Ctr. v. Office of Admin. Hearings*, 2009 WL 162066, at *5 (Cal. Ct. App. Jan. 26, 2009) (affirming decision by administrative hearing officer that GED used by JRC constitutes corporal punishment). Notably, the California Court of Appeal notes in this decision that "JRC does not contest on appeal the ALJ's factual finding that JRC employs corporal punishment." *Id.* at *3 n.3.

[31] *See* App. to Opening Br. at A291 (No. 93). The following exchange occurred during the March 12, 2014 Clarification Conference:

> Ms. Woolfolk: I want the record to be clear that DDDS met with both sets of parents in Delaware and explained to them exactly the next steps in the process that was going on.
>
> Hearing Officer: When was this approximately? Was this before or after the October 2013 letters?
>
> Ms. Woolfolk: I believe it was just about at the same time.

In letters dated October 8 and 13, 2013 to the JRC, DHSS advised JRC that it was aware of the Region I Letter. The DDDS also cited to language of Delaware's HCBS Waiver and attached a copy of Delaware's Policy on Behavior and/or Mental Health Supports which prohibited "the use of *mechanical restraints, corporal punishment or threat of corporal punishment . . . physical interventions which cause pain . . . .*"[32] It warned JRC that services provided to Delaware's two residents at JRC must comply with Delaware's HCBS Waiver standards. Accordingly, it directed JRC to submit a plan to DDDS "outlining a timeframe for the discontinuance of the use of all aversive[s]," and stated that "discontinuation of all aversive[s] must be completed within 60 days from receipt of this letter."[33]

In response, on November 27, 2013, Appellants filed a Request for a Fair Hearing with DHSS, arguing that GED treatment services should continue uninterrupted.[34] In response to this request, on December 16, 2013, DHSS filed a Fair Hearing Summary which stated that "[n]o action was taken," and that assistance was being continued.[35]

---

Hearing Officer: Just about the same, okay go ahead.

Ms. Woolfolk: We met with them in Delaware each of them did . . . . There was certainly no blindsiding here of parents. And I want the record to be clear on that.

*Id.* Ms. Woolfolk represents DHSS in her capacity as Deputy Attorney General for the State of Delaware's Department of Justice.

[32] *Id.* at A14 (emphasis added).

[33] *Id.*

[34] *Id.* at A18.

[35] *Id.* at A46–47. The Fair Hearing Summary (*id.* at A46–95) attached the Delaware HCBS § 1915(c) waiver; 42 C.F.R. §§ 441.302, 441.303; and the DDDS Policy: Behavior and/or Mental Health Supports. It states that "[a] granted HCBS waiver may be terminated if the health and welfare assurances approved in the DE waiver are not met," and that "Delaware is pursuing

16

DDDS filed a Motion to Dismiss this request on March 6, 2014. A clarification conference was thereafter conducted to discuss procedural and substantive issues and DDDS filed a supplemental Motion to Dismiss. The hearing was set for July 15, 2014. The administrative proceedings were stayed while Appellants pursued an appeal in the Superior Court of the Hearing Officer's disposition of April 25, 2014, and specifically, her determination that the reasonableness and necessity of using Level III interventions was not at issue.[36] The appeal was dismissed on February 10, 2015 as an improper interlocutory appeal and remanded. The hearing was reset for June 30, 2015. Again, the parties requested clarification on the scope of the hearing and DHSS renewed its Motion to Dismiss. Appellants expressed concern that they were not given the opportunity to fully brief the issues raised by DHSS in its Motion in Dismiss and that they were entitled to an evidentiary hearing, including evidence of medical necessity of the GED, prior to oral argument on DHSS's Motion to Dismiss.[37]

In the midst of the procedural wrangling over the scope of the continued Fair Hearing, Delaware's Medicaid director, Stephen Groff, sought clarification from Region

---

compliance with its waiver regulations." *Id.* at A47. It also identified who was expected to testify for the State, including "[o]fficials of DHSS with knowledge of the laws, practices and regulations of the Center of Medicare and Medicaid Services." *Id.* at A47.

[36] *Id.* at A358–59; *see also id.* at A350 ("Based on . . . (1) letters of [DDDS] sent in October 2013 to [JRC] . . . (2) [DHSS's] Motion to Dismiss Fair Hearing Request for [Recipients] dated March 6, 2014, and (3) the clarification conference, reasonableness and necessity of using aversive behavioral interventions . . . including [GED], on [Recipients] is not an issue in this fair hearing proceeding.").

[37] *See id.* at A593.

III on the use of the GED on December 23, 2014 since Delaware is in Region III, not Region I. CMS responded on March 10, 2015 to Mr. Groff (the "2015 CMS Letter"). In that letter from Ralph Lollar, Director, Division of Long Term Services and Support of CMS, Lollar confirmed to DDDS that electric shock treatment is inconsistent with HCBS settings. He wrote:

> Residential facilities and the use of aversive interventions including electrical shock using a graduated electronics decelerator (GED) are regulated by the State. The State asserts that the use of aversive interventions is prohibited in the state's HCBS programs. The State has requested clarification from [CMS] regarding the use of GED devices and denial of nutritionally adequate diets in home and community-based settings. Electric shock therapies and withholding of meals are not characteristic of HCBS settings; we therefore request that the State provide immediate assurance that the use of these aversive interventions has been eliminated for any and all settings in which individuals enrolled in Medicaid live or receive services.
>
> Additionally, per the State's letter, procedures that include physical interventions which cause pain are considered aversive interventions prohibited by the State. Therefore, this condition must be met immediately and these practices must cease and desist. The State should cease all billing for FFP [federal financial participation] for individuals receiving Medicaid services through providers practicing *any* of the above referenced procedures.[38]

Following briefing and oral argument on DHSS's Motion to Dismiss Appellants' Fair Hearing request, the Hearing Officer issued an order on November 30, 2015 (the "Bifurcation Order"). The Hearing Officer determined that "both the federal regulations and even more narrowly, DHSS's own policy require a Fair Hearing to go forward."[39] She

---

[38] *Id.* at A576 (emphasis in original).

[39] *Id.* at A853. In support of her determination, the Hearing Officer cited to 42 C.F.R. § 431.200(b), 42 C.F.R. § 431.201 and 16 Del. Admin. C. § 5100(1).

18

further ruled that "before considering whether the GED treatment services are medically necessary, the first issue that must be decided is whether these services are indeed covered . . . ."[40] Accordingly, the Hearing Officer ruled that "the Fair Hearing shall proceed as a bifurcated process considering the issue of Medicaid coverage first, followed by the medical necessity of GED treatment services, if Medicaid coverage is sustained."[41]

Appellants thereafter filed a Motion *in Limine* arguing that they should be able to present evidence related to the reasonableness and necessity of aversive services at the Fair Hearing. That issue, along with the primary coverage issue, was considered at the Fair Hearing which occurred on January 13, 2016. The Hearing Officer admitted 209 exhibits into evidence without objection from either party.

Following the Fair Hearing, on April 21, 2016, the Hearing Officer issued a final decision (the "Final Decision").[42] The Hearing Officer first explained her decision to deny Appellants' Motion *in Limine* wherein Appellants had sought to present evidence that GED was a medically necessary treatment for Appellants. Appellants also had contended that the issue of coverage was, in part, dependent upon the issue of medical necessity. DHSS had countered that while all covered services must be medically necessary, not all medically necessary treatments are covered.

The Hearing Officer ruled that "[i]f the GED treatment services at issue are indeed prohibited services under Delaware's Medicaid program, medical necessity simply cannot

---

[40] App. to Opening Br. at A853 (No. 93).

[41] *Id.*

[42] *Id.* at A952–82.

19

be reached."[43]   However, "if the GED treatment services are covered services under Delaware Medicaid, then arguably, the state erred in instructing JRC to discontinue the services and medical necessity should be considered."[44]  Accordingly, the Hearing Officer ruled that "contrary to Appellants' assertions, a medically necessary treatment does not automatically equate to Medicaid coverage."[45]

The Hearing Officer next considered whether electric shock treatment was a covered service under Medicaid and concluded that it was not.  The Hearing Officer summarized the arguments on both sides that had been presented at the January 13, 2016 Fair Hearing.

DHSS contended that GED was prohibited by both state and federal law.  As for state law, DHSS pointed to the HCBS Waiver which was duly enacted and approved by CMS on July 1, 2014 and it had the force of law.

As for the federal level, DHSS pointed out that the 2015 CMS Letter had been signed by the head of the CMS Division of Long Term Care Services—the CMS branch that oversees the implementation of the HCBS Rule in all Medicaid funded community services nationwide.  Thus, DHSS contended that it applied not solely to Regions I or III, but rather, it applied nationwide.  According to DHSS, this letter meant that federal law prohibited the use of electric shock in all community settings nationwide.[46]  Thus, DHSS

---

[43] *Id.* at A955.

[44] *Id.*

[45] *Id.*  In support of this proposition, she cited *Beal v. Doe*, 432 U.S. 438, 444 (1977) ("But nothing in [Title XIX] suggests that participating States are required to fund every medical procedure that falls within the delineated categories of medical care.").

[46] App. to Opening Br. at A957 (No. 93).

argued that the prohibition on GED aversive treatment represented a considered judgment by state officials, through the HCBS Waiver, and by federal officials, through the CMS letters, that the GED treatment services, though formerly covered, would no longer be a covered Medicaid service.

Appellants, on the other hand, contended that the CMS letters are neither policy nor regulations, but rather, are guidance only. They argued that the controlling regulation is the HCBS Setting Rule (which became effective March 17, 2014) which refers to the use of "*coercion or restraint*," but which does not specifically refer to aversives, let alone GED in particular. In addition, Appellants argued that in the renewed HCBS Waiver, DDDS, by eliminating GED as a treatment modality, has undermined the goals of the waiver program by eliminating Appellants' ability to remain in a community-based setting.

After considering the arguments, along with 209 exhibits submitted by the parties, the Hearing Officer ruled that "the evidence supports that the DDDS instruction in October 2013 to JRC to cease using GED treatment services was correct and well within its authority under the Delaware HCBS Waiver."[47] Further, she held that "[t]he fact that the duly promulgated Delaware HCBS Waiver carries the force and effect of law cannot be seriously disputed."[48]

---

[47] *Id.* at A966.

[48] *Id.*

The Hearing Officer then rejected Appellants' argument that the CMS letters do not constitute regulatory authority. Rather, she concluded that "an agency interpretation of its own regulation is authoritative."[49] She explained her reasoning as follows:

> [T]he CMS letter to Delaware dated March 10, 2015 was authored by the Director of the CMS Division of Long Term Care Services, which is the CMS branch responsible for overseeing the implementation of the HBCS Rule in all Medicaid funded community services nationwide. Certainly, a response from the national Director of the CMS branch responsible for the HCBS waivers that is directly on point should be given substantial deference. Moreover, review of the CMS letter to Delaware finds that the text specifically references GED as a prohibited aversive not covered under the HCBS Waiver. Further, the CMS letter to Delaware clearly mandates the state should "cease all billing for FFP [federal financial participation] for individuals receiving Medicaid services through providers practicing any" aversive interventions. Appellants' argument that GED treatment services remain covered under Medicaid as a behavioral intervention is simply not supported.[50]

Finally, the Hearing Officer rejected Appellants' contention that they were somehow limited on the coverage issue because they could not present evidence as to medical necessity to support their coverage position and that the Hearing Officer had restricted the Fair Hearing to argument only. She emphasized that, "[t]o be clear, this Fair Hearing Officer's [Bifurcation Order] in no way limited either the Appellants' or DHSS's ability to present evidence and/or testimony to prove Medicaid coverage in the first part of this Fair Hearing."[51] She explained:

> [M]edical necessity does not automatically guarantee Medicaid coverage. At the onset of this Fair Hearing, this Fair Hearing Officer asked both sides if there would be any witnesses presented. Apparently, as stated on the record,

---

[49] Id.

[50] Id.

[51] Id.

Appellants asked DHSS, without clarification from this Fair Hearing Officer, if witnesses were permitted during the first part of this Fair Hearing. DHSS advised that it understood the first part of the Fair Hearing was limited to argument only. Again, this Fair Hearing Officer did not limit either sides' ability to present witnesses and/or testimony to provide Medical coverage in the first part of this Fair Hearing. Although Appellants argued that they had to present witnesses and testimony on medical necessity to prove Medicaid coverage, this argument is also unsupported. Consequently, denying Appellants' Motion in Limine did not limit Appellants' ability to provide testimony to support the Medicaid coverage.[52]

The Guardians filed an administrative appeal of the Hearing Officer's Final Decision in the Delaware Superior Court pursuant to 31 *Del. C.* § 520. The Guardians argued that they had received inadequate notice of DHSS's treatment mandates, that DHSS provided an inadequate Fair Hearing summary with shifting legal justifications for its actions, and that DHSS engaged in coercive and prejudicial conduct resulting in a denial of due process. They argued further that the Hearing Officer's decision was not supported by substantial evidence and that it was incorrect because electronic shock treatment was and remains a covered service.

Following briefing and oral argument, the Superior Court rejected each of these contentions in an opinion dated January 30, 2018. First, it concluded that bifurcating the Fair Hearing did not result in a denial of due process. Further, "the parties were not limited in their ability to allow evidence regarding Medicaid coverage, including by witness testimony."[53] Thus, it ruled that "[h]ad the Hearing Officer determined that GED was a

---

[52] *Id.* at A967.

[53] *Oldham v. Dep't of Health and Soc. Servs.*, 2018 WL 776580, at *5 (Del. Super. Jan. 30, 2018).

23

covered service, no doubt the Guardians would have had a full opportunity to present their case in support of medical necessity."[54]

Next, the Superior Court concluded that both state and federal law support the Hearing Officer's conclusion that aversives are not a Medicaid covered service. On the state level, it held that the HCBS Waiver, in providing that "[t]he use of averse conditioning, defined as the contingent application of startling, painful, or noxious stimuli is prohibited," "undoubtedly prohibits the use of GED and terminates its coverage as a Medicaid service."[55] Moreover, the HCBS Waiver has "the force and effect of law" as it was validly promulgated pursuant to legislative authority. The Superior Court explained:

> Here, DHSS amended its waiver through the formal rulemaking process by gathering input from providers and advocates, convening public hearings and comment, and publishing notice of the waiver as a proposed final regulation. Delaware's HCBS waiver therefore carries the force and effect of law and substantiates the Hearing Officer's conclusion—aversives are not Medicaid covered services.[56]

The Superior Court also rejected Appellants' argument that GED was a necessary behavior support service and thus was covered under Delaware's HCBS Waiver. It reasoned that "[a]versives cannot be prohibited outright by the waiver, but also—as the Guardians propose—covered by the waiver."[57]

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.* at *6.

24

As to the prohibition on GED at the federal level, the Superior Court concluded that the 2012 Region I Letter and the 2015 CMS Letter are agency interpretations of CMS's own regulation "and are therefore entitled to mandatory judicial deference."[58] Further, the HCBS Setting Rule, which assures an individual's right to freedom from coercion and restraint, was interpreted by CMS as prohibiting the use of aversives such as GED. According to the Superior Court, "[s]uch an interpretation is entitled to mandatory judicial deference."[59] Thus, "according to federal law, state law, and the federal agency tasked with interpreting the HCBS Rule, the Hearing Officer's conclusion that GED is not a Medicaid covered service is correct."[60]

As to the various procedural due process challenges, the Superior Court rejected them and observed that the "Guardians offer no evidence that they were unprepared, no evidence that notice was not received, or that the hearing was held without them, and nothing to the effect that they did not understand the issues or the bases for the decision in question."[61] In fact, "the Guardians received exactly what they sought"—namely, "[t]hey engaged in a full evidentiary Fair Hearing in which they were prepared to argue the issues raised, permitted to produce any evidence on the issue of Medicaid coverage, and to raise

---

[58] *Id.* at *5.

[59] *Id.* at *6.

[60] *Id.*

[61] *Id.*

arguments as to why aversives were still Medicaid Covered Services."[62] Accordingly, the Superior Court concluded that granting reversal would be elevating form over substance.

Finally, the Superior Court rejected Appellants' claim based on Title II of the Americans with Disabilities Act ("ADA") as it had not been fairly raised in the proceedings below.

## III.    Issues on Appeal

Appellants raised three issues on appeal. First, they argue that the administrative process preceding the Hearing Officer's decision violated their due process rights. Second, they contend that aversive treatments (and specifically GED) are covered under Delaware's Medicaid waiver program and that their rights were violated by DHSS through *post hoc* rule-making and interpretations. They contend that because an individual's specific medical needs are integral to the issue of whether or not a particular service might be "covered" under the HCBS Waiver, the Hearing Officer erred in precluding evidence regarding Appellants' medical needs. Finally, they contend that the Final Decision constitutes prohibited discrimination by DHSS against Appellants in violation of Title II of the Americans with Disabilities Act ("ADA").

## IV.    Standard of Review

The Final Decision of the Hearing Officer was subject to review by the Superior Court pursuant to 31 *Del. C.* § 520.[63]  The Superior Court was required to determine

---

[62] *Id.*

[63] Section 520 provides in relevant part:

26

whether the Hearing Officer's Final Decision was supported by substantial evidence and free from legal error.[64]  Our standard of review "mirrors that of the Superior Court."[65] "Where there is a review of an administrative decision by both an intermediate and a higher appellate court and the intermediate court received no evidence other than that presented to the administrative agency, the higher court does not review the decision of the intermediate court, but, instead, directly examines the decision of the agency."[66]  Further, "[o]n appeal from an administrative agency the reviewing court must determine whether the agency ruling is supported by substantial evidence and free from legal error."[67] Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.[68]  Questions of law are reviewed *de novo*.[69]

---

> Any . . . recipient of public assistance benefits . . . against whom an administrative hearing decision has been decided may appeal such decision to the Superior Court . . . .  The appeal shall be on the record without a trial de novo.  The Court shall decide all relevant questions and all other matters involved, and shall sustain any factual findings of the administrative hearing decision that are supported by substantial evidence on the record as a whole.

31 *Del. C.* § 520.

[64] *See Lawson ex rel. Lawson v. Dep't of Health and Human Servs.*, 2004 WL 440405, at *2 (Del. Super. Feb. 25, 2004).

[65] *Stoltz Mgmt. Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del. 1992).

[66] *Id.* (internal citations omitted).

[67] *Id.* (internal citations omitted).

[68] *See Lehto v. Bd. of Educ.*, 962 A.2d 222, 225–26 (Del. 2008).

[69] *See Delaware Dep't of Nat. Res. & Envtl. Control v. Sussex Cnty.*, 34 A.3d 1087, 1090 (Del. 2011).

## V. Analysis

### A. The Procedural Due Process Challenges

Although framed primarily as a series of due process challenges, Appellants' main challenge raises a question of Medicaid coverage, namely, whether aversive treatment, including the use of a GED, is covered. They challenge the Hearing Officer's decision to consider that threshold question first, and argue that the procedure employed by the Hearing Officer deprived them of their right to a meaningful, pre-deprivation process and hearing. The foundation for this right, according to them, is constitutional, statutory, and regulatory in nature.

DHSS contends that CMS's and DHSS's determination to no longer fund what they deem an intolerable practice is a regulatory determination, which Appellants have no legal right to challenge. Rather than being targeted discrimination, DHSS contends that CMS's and DHSS's prohibitions against coercion and the use of aversives are not adjudications, but rather, are duly promulgated regulatory and policy decisions that apply to all Medicaid-qualified providers and recipients. Thus, DHSS contends that no hearing was required because the decision to ban GED was not based on individualized findings. Rather, CMS directed, and DHSS determined, as a matter of public policy, that using such intolerable and coercive methods to enforce behavioral compliance was unacceptable for all Medicaid recipients receiving home and community-based services.

28

DHSS relies on the United States Supreme Court's 1915 decision in *Bi-Metallic Investment Co. v. State Board of Equalization*[70] for the proposition that regulatory acts that apply broadly, unlike adjudications, do not trigger individual rights to challenge such policy decisions. In *Bi-Metallic*, the Supreme Court held that procedural due process rights did not apply to the enactment of legislation when the Colorado Tax Commission and the State Board of Equalization had ordered a 40% increase in the valuation of all taxable property in Denver. The plaintiff sought to enjoin enforcement of the order arguing that it had been denied a right to a hearing. The Supreme Court held that a hearing was not required for each affected property owner prior to the enactment of the generally applicable tax increase, reasoning that:

> Where a rule of conduct applies to more than a few people, it is impractical that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in a town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.[71]

A number of cases since *Bi-Metallic* have held that in altering substantive rights of people through the enactment of rules of general applicability, a legislature generally provides all of the constitutionally required process that is due simply by enacting the

---

[70] 239 U.S. 441 (1915).

[71] *Id.* at 445.

statute, publishing it, and to the extent it regulates private conduct, affording those affected

a reasonable opportunity to familiarize themselves with the requirements and to comply.[72]

Applying this principle in the Medicaid context, a number of cases have held that a

hearing need not be granted when either state or federal law requires automatic grant

adjustments for classes of Medicaid recipients unless the reason for an individual appeal is

an incorrect grant computation.[73] Relying on these authorities, DHSS maintains that both

the federal and State's ban on coercion in home and community-based settings reflected

broad policy determinations at the federal and state levels, did not involve individual

findings regarding the Recipients, is governed by the *Bi-Metallic* line of cases, and thus,

no hearing was required at all. They also cite to Medicaid regulations which state that no

---

[72] *See, e.g.*, *United States v. Locke*, 471 U.S. 84, 108 (1985) (holding that no individualized notice was required where the statute was generally applicable, published, and afforded the affected landowners a reasonable opportunity to understand and comply with the requirements); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) ("[T]he legislative determination [terminating a welfare program or granting defenses and immunities to state officials] provides all the process that is due.").

[73] *Rosen v. Goetz*, 410 F.3d 919, 926 (6th Cir. 2005) ("The regulations grant a broad right to an evidentiary hearing (when a recipient believes that the agency has 'taken an action erroneously' in terminating benefits, § 431.220(a)(2)) and impose a broad limitation on that right (when the sole issue is a law 'requiring an automatic change' in benefits, § 431.220(b)). An interpretation of the regulations that invariably respects a recipient's claim that 'erroneous[]' action has been taken, even when the termination of benefits arises solely from a change in state or federal law, necessarily slights the provision stating that a hearing need not be given in the face of 'an automatic change' in benefits. By contrast, a reading of the regulation that draws a dichotomy between impermissible challenges to a State's legal or policy judgment on the one hand and permissible challenges to the relevant facts or application of law to a given beneficiary respects *both* regulations."); *see also, e.g.*, *Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978) ("[W]hen a state decides to terminate optional benefits on the basis of lack of appropriated funds, or for any other state reason, this is a matter of state law or policy which it was permitted to adopt.").

hearing is required "if the sole issue is a federal or state law requiring an automatic change adversely affecting some or all beneficiaries."[74]

Appellants, on the other hand, rely on the Supreme Court's seminal decision in *Goldberg v. Kelly*,[75] which involved the question of what process was due to recipients who faced termination of welfare benefits. Appellants argue that they were entitled to procedural due process *before* the proposed termination of GED treatment in October 2013, including timely and adequate notice detailing the reasons for termination and a meaningful, pre-deprivation evidentiary hearing. They claim that these rights, though derived from *Goldberg*, are also embedded in federal and state laws and regulations.

In particular, Appellants cite to a number of federal regulations within the Medicaid regulatory scheme that they contend apply in the context of a threatened termination of Medicaid benefits.[76] They contend that Delaware regulations either mirror or expand the procedural due process rights of Medicaid beneficiaries beyond the federal requirements.[77] Further, they argue that the Delaware Social Security Manual requires "adequate notice" even when changes in federal or state law require automatic adjustments for benefits rendered to certain classes of individuals, and even if no hearing is required.[78]

---

[74] 42 C.F.R. § 431.220(b) (2017).

[75] 397 U.S. 254 (1970).

[76] *See, e.g.*, 42 C.F.R. §§ 431.200(a)–(b), 431.220(a)(1)–(2), 431.242(c)–(d), 431.241(a)–(b), 431.221(b) (2017).

[77] They cite to 16 Del. Admin. C. §§ 5000 *et seq*.

[78] *See* DSSM § 5302(K) (requiring such mass change notices [to] "be adequate and timely" and include statements regarding the state's intended action, the reasons for the intended action, the

31

Here, Appellants face the termination of GED treatment (including the termination of federal funding) that had, for many years, been a covered Medicaid service. But, Appellants have continued to have these services available through the present, and the State has committed to pay for all of their services at JRC until Ashlee's and Robert's transition out of JRC is complete.[79]

Under federal law, states choosing to participate in Medicaid must provide a core set of mandatory services to qualified beneficiaries.[80] States may also cover other optional categories of services. These optional services are then part of the state's Medicaid plan. As such, they are subject to the requirements of federal law.[81] Factored into this mix is our recognition that both the federal and state governments are entitled to make policy decisions as to which services are no longer consistent with community-based settings.[82] Given this unique factual scenario, the question here is: what process was due?

specific change in law, and "circumstances under which a hearing may be obtained and assistance continued[.]").

[79] The Agreements to Participate in Transition, signed by Ashlee's and Robert's parents in April 2015, provide that "[w]e affirm that DDDS has committed to pay for [Ashlee's and Robert's] supports [sic] during the transition, and that [JRC] will receive payment for the services it provides to [Ashlee and Robert] during the transition at the conclusion of the transition, as stated in the Division's October 3, 3014 letter to JRC and the Division's October 10, 2014 letter to us." App. to Opening Br. at A782–83 (No. 93).

[80] *See* 42 U.S.C. §§ 1396a (a)(10)(A), 1396d (a) (2018); *see also Lawson*, 2004 WL 440405, at *3 ("The State of Delaware recognizes that Medicaid benefits are property rights and as such, the recipient may not be deprived of these benefits without due process of law.").

[81] *Doe 1-13 ex rel Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 721 (11th Cir. 1998) ("'[W]hen a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law.'" (quoting *Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir. 1997))).

[82] *See, e.g.*, *Atkins v. Parker*, 472 U.S. 115, 129 (1985) ("The procedural component of the Due Process Clause does not 'impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits.'" (quoting *Richardson v. Belcher*,

We first consider the issue of constitutional due process and address Appellants' contention that they were entitled to an evidentiary hearing prior to the State's "action" in sending letters to JRC in 2013 demanding termination of GED. They rely heavily on *Goldberg*, where the United States Supreme Court held that before a state can terminate a recipient's welfare benefits, due process requires that the recipient be afforded an adequate hearing.[83] The Supreme Court said, in that context, that due process requires: (i) timely and adequate notice detailing the reasons for a proposed termination; (ii) an effective opportunity for the recipient to defend by confronting any adverse witnesses and by presenting arguments and evidence orally; (iii) retained counsel, if desired; (iv) an impartial decision-maker; (v) a decision resting solely on the legal rules and evidence addressed at the hearing; and (vi) a statement of the reasons for the decision and the evidence relied upon.[84]

Federal regulations require that a state agency must provide a "fair hearing" which satisfies the *Goldberg* requirements.[85] These requirements are imputed to the states via the

---

404 U.S. 78, 81 (1971))); *Benton*, 586 F.2d at 3–4 (distinguishing *Goldberg* on the grounds that "[t]he present case involves only the termination of optional benefits which the state was never required to provide in the first place," stating that "[w]e find nothing in the Federal or State Constitutions giving prospective recipients of optional benefits a constitutional right to their perpetual existence," and holding that "matters of law and policy are not subject to any hearing requirements under the applicable regulations, whether the hearing be pre- or post-reduction").

[83] *Goldberg*, 397 U.S. at 261.

[84] *Id*. at 267–68, 270–71.

[85] *See*, *e.g.*, 42 C.F.R. § 431.202 ("A State plan must provide that the requirements of §§ 431.205 through 431.246 of this subpart are met."). Section 431.205(d) provides that "[t]he hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart."

Fourteenth Amendment and "are only triggered when adverse actions, such as the denial of benefits, are implemented by state action."[86]

Notably, the Supreme Court in *Goldberg* focused on welfare benefits needed for basic subsistence. In addition, the Supreme Court declined to reach the issue of "whether due process requires only an opportunity for written submission, or an opportunity both for written submission and oral argument, where there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues."[87]

Several years after *Goldberg,* in *Mathews v Eldridge*,[88] the Supreme Court rejected the contention that a pre-termination evidentiary hearing (as opposed to a post-termination hearing) was required before termination of social security disability benefits. It observed that "[o]nly in *Goldberg* has the Court held that due process requires an evidentiary hearing prior to a temporary deprivation."[89] In *Goldberg*, "it was emphasized there that welfare assistance is given to persons on the very margin of subsistence."[90] The Court observed in *Mathews* that eligibility for disability benefits, by contrast, is not based upon financial need.[91]

---

[86] *Lawson*, 2004 WL 440405, at *4 (citing *Perry v. Chen*, 985 F. Supp. 1197, 1201 (D. Ariz. 1996)).

[87] *Goldberg*, 397 U.S. at 268 n.15.

[88] 424 U.S. 319 (1976).

[89] *Id.* at 340.

[90] *Id.*

[91] *Id.* at 340–41.

In *Mathews*, the Supreme Court observed further that "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands.'"[92] Reflecting the flexibility inherent in the due process analysis, the Supreme Court stated that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"[93] Further, it held that "resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected."[94]

Many cases suggest that *Mathews'* pragmatic approach takes into account the fact/law dichotomy.[95] For example in the context of a reduction of termination in AFDC

---

[92] *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information and it must afford a reasonable time for those interested to make their appearance. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied." (internal citations omitted)).

[93] *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

[94] *Id.* at 334–35 (noting that due process requires consideration of three distinct factors, namely, "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administration burdens that the additional or substitute procedural requirement would entail" (internal citations omitted)).

[95] *See, e.g.*, *Codd v. Velger*, 429 U.S. 624, 627 (1977) ("[I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation."); *Rosen*, 410 F.3d at 928 ("And since *Goldberg*, the [United States Supreme] Court has explained that the due process requirement that the government provide a hearing before the termination of benefits turns on the sensible fact/law dichotomy that CMS, the State and *Benton* have drawn."); *Ortiz v. Eichler*, 794 F.2d 889, 893–94 (3d Cir. 1986) (distinguishing cases where less detailed pre-hearing notice was required in denying or terminating Aid to Families with

benefits, the Court of Appeals for the First Circuit distinguished between across-the-board

reductions in welfare benefits mandated by a statutory change, and reductions based upon

individualized determinations.  It stated that for across-the-board reductions, "this court

has recognized that due process may set a lower standard for determining a notice to be

adequate than where the reduction or termination of aid is on an individual basis."[96]

Four years after *Mathews*, the United States Supreme Court, in *O'Bannon v. Town

Court Nursing Center*,[97] held that nursing home residents had no constitutional right to a

hearing before a state or federal agency revoked the home's authority to provide them with

nursing care at the government's expense.  The Court acknowledged that when

government's enforcement of standards requires decertification of a facility, "there may be

an immediate, adverse impact on some residents."[98]  Nevertheless, it held that "surely that

---

Dependent Children, Food Stamps, and Medicaid benefits where those cases did not concern "individual eligibility determinations," but rather, involved "a legislatively mandated substantive change in the scope of the entire program" (quoting *Atkins*, 472 U.S. at 129)); *Washington v. DeBeaugrine*, 658 F. Supp. 2d 1332, 1335 (N.D. Fla. 2009) ("Both sides have agreed further that there is no right to a hearing when there is no factual issue attending a denial or reduction of benefits—that is, when there is no factual issue to be heard.  The governing regulation confirms this, saying that the agency 'need not grant a hearing if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all recipients.'  Thus, for example, when a state validly changes its law in a way that, without factual dispute, ends a person's benefits, no hearing is required.  The right to a hearing when the recipient believes the agency has acted 'erroneously' thus means 'factually erroneously.' (internal citations omitted)).

[96] *LeBeau v. Spirito*, 703 F.2d 639, 644–45 (1st Cir. 1983) (citing *Velazco v. Minter*, 481 F.2d 573, 577 (1st Cir. 1973)).

[97] 447 U.S. 773 (1980).

[98] *Id.* at 787.

impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty or property."[99]

In view of the unique facts presented here, we believe that as a matter of federal due process, no pre-termination hearing was required. In other words, even assuming, *arguendo*, the October 2013 letters constituted formal "action" within the meaning of the federal regulations discussed below, Appellants had no constitutional right to a hearing prior to these letters being sent. Further, even though only two Delaware citizens are impacted by the ban on aversives, those regulatory pronouncements are more credibly viewed as broad-based policy decisions and not discriminatory decisions based on facts unique to these individuals. The agency decisions to terminate GED here are broad-based prohibitions against the use of coercion and restraint, including GED. The record before us supports the State's characterization of them as a product of formal rule-making (the Setting Rule and HCBS Waiver) designed to safeguard all potentially impacted Medicaid recipients. We do not think the record supports Appellants' contention that these changes were a manufactured litigation tactic directed to them.[100] Having determined that no pre-

---

[99] *Id.* The Supreme Court further explained that "[t]he simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to all of the cases on which the patients rely in this Court." *Id.* at 788. Just as decertification resulted from the home's noncompliance with HEW's standards, here, the decision to cut funding to JRC resulted from its noncompliance with the Setting Rule and HCBS Waiver rules.

[100] Persons with disabilities have faced societal, attitudinal, and institutional barriers over time. Consider Justice Oliver Wendell Holmes' decision in *Buck v. Bell*, 274 U.S. 200 (1927). In *Buck*, Justice Holmes upheld a statute requiring the sterilization of Carrie Buck, a "feeble-minded" woman committed to an institution, holding that "[i]t is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can

termination hearing was required as a matter of constitutional due process, there remains the question of whether DHSS complied with applicable federal and state statutory and regulatory requirements. Here, Appellants did receive a hearing eventually, but they raise challenges as to its adequacy and to the notice they received. We address these points below.

*1. The Adequacy of the Fair Hearing*

Although a pre-termination hearing was not required as a matter of constitutional due process, the Hearing Officer, relying on 42 C.F.R.§ 431.200(b), 42 C.F.R. 431.201 and 16 Del. Admin. C. § 5100(1), ruled that a Fair Hearing was required under the applicable regulations.

Section 431.200(b) "[p]rescribes procedures for an opportunity for a hearing if the State agency or non-emergency transportation [Prepaid Ambulatory Health Plan] . . . takes action, as stated in this subpart, to suspend, terminate, or reduce services, or of an adverse benefit determination by [a Managed Care Organization], [Prepaid Inpatient Health Plan] or PAHP under subpart F of part 438 of this chapter . . . ."[101] Section 431.201 defines "action" as a "termination, suspension, or reduction of Medicaid eligibility."[102] Further

---

prevent those who are manifestly unfit from continuing their kind." *Id.* at 205, 207. He noted further that "[t]here generations of imbeciles are enough." *Id.* at 207. Fortunately, states have continued to repeal and revise laws over time with a view towards protection of society's most fragile populations.

[101] 42 C.F.R.§ 431.200(b) (2017).

[102] Appellants also rely on 42 C.F.R. § 431.241 (2017) ("Matters to be considered at the hearing"). Section 431.241(a) states that the hearing must cover "[a]ny matter described in § 431.220(a)(a) for which an individual requests a fair hearing," which includes "[a] change in the amount or type of benefits or services . . . ." 42 C.F.R. § 431.220(a)(1)(iv) (2017). Federal regulations require that when a state agency takes any "action" affecting an individual's Medicaid

"According to Delaware's Division of Social Services Manual ("DSSM"), Section 5001(1), entitled, Providing the Opportunity for a Fair Hearing, states:

> This policy applies to all applicants and recipients of DSS and DMMA for services provided directly by the Agencies or through agreements with other State or contracted entities where the applicant or recipient claims that he/she has been adversely impacted by a specific action taken by DSS or DMMA. An opportunity for a fair hearing will be provided, subject to the provisions of this section, to any individual requesting a hearing who is dissatisfied with a decision of the [DSS] or the [DMMA].

There is some tension in the rules as 42 C.F. R. § 431.220(b) states that "[t]he agency need not grant a hearing if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all beneficiaries." Also, Section 5307(B) of the DSSM provides that "[t]he hearing officer of the Divisions will dismiss or deny a request for a fair hearing where the sole issue is one of state or federal law requiring automatic benefit adjustments. . . ." The parties continue to argue before this Court as to whether any "action" was taken and whether a hearing was required.[103] We think there are strong arguments that what Appellants are really challenging here is the broad-based policy decision to ban GED, and that the public notice and comment process by which those regulations were enacted

---

claim, it must provide notice to the individual of the action in accord with 42 C.F.R. § 431.210 (2017). An "action" is the "termination, suspension, or reduction in Medicaid eligibility . . . ." 42 C.F.R. § 431.201 (2017). Ten days' advance notice of the action is required, "except as permitted under §§ 431.213 and 431.214." 42 C.F.R. § 431.211 (2013).

[103] DHSS asserted before the Hearing Officer that "if there had been a reduction or if the state was proposing a reduction in services the state certainly agrees that would give rise that is an action that would give rise to the right to a fair hearing." App. to Opening Br. at A290 (No. 93). Instead, the State's position was that "there has been no reduction in services." *Id.* ("These residents both remain fully funded under the Medicaid Program for the services they're getting up to JRC. . . . The only difference is the state is prohibiting this provider from using an aversive that violates federal law.").

39

provided sufficient notice and opportunity to be heard. But under the circumstances presented here, we find no error with the Hearing Officer's determination to conduct a hearing, especially given that GED had been a covered service for years, given that the Setting and HCBS Waiver regulations were in the process of being revised during the period of time leading up to the Fair Hearing, and given that the parties disputed the legal effect of the CMS letters.

Recognizing that a Fair Hearing was held, the real focus here is on Appellant's challenges to its adequacy. We first consider their challenge to the Bifurcation ruling. Appellants contend that bifurcation of their hearing deprived them of their due process rights. They assert that bifurcation of the issues prevented evidence of medical necessity, which they insist is critical in determining whether GED is considered a covered service under Medicaid.

The Hearing Officer determined if Appellants could demonstrate that GED is a covered service, then the Hearing Officer would provide a second evidentiary hearing on the medical necessity issue. Specifically, she held that "before considering whether the GED treatment services are medically necessary, the first issue that must be decided is whether these services are indeed covered services under Medicaid and/or whether the state erred when instructing JRC to permanently cease using the GED treatment services."[104] She ruled that "[t]he Fair Hearing shall proceed as a bifurcated process considering the

---

[104] *See id.* at A853.

40

issue of Medicaid coverage first, followed by the medical necessity of GED treatment services, if Medicaid coverage is sustained."[105]

A hearing officer has the authority to bifurcate evidentiary hearings and restrict the issues raised at the hearings pursuant to 16 Del. Admin. C. § 5304.3.[106] This is not disputed. The Hearing Officer ultimately determined that a claim that GED treatment is medically necessary does not mean that it is covered under the HCBS Waiver program.[107] In her Final Decision she reiterated that "[t]aken as a whole, consideration of whether the GED treatment services at issue are medically reasonable and necessary is a moot issue if Delaware's Medicaid program prohibits these treatment services."[108] We find no error in the Hearing Officer's handling of the Fair Hearing. Appellants were afforded the full opportunity to present evidence as to Medicaid coverage of GED.[109] Appellants would have been able to present evidence on medical necessity had they prevailed on the threshold

---

[105] *Id.*

[106] It provides in relevant part:

> The Hearing Officer has the authority to restrict the issues raised at the hearing. The following issues may be raised at the hearing.
>> A. Issues described in the notice of action sent to the appellant
>> B. Issues fairly presented in the appellant's request for a hearing
>> C. Issues fairly presented in the Division's response in its hearing summary.

16 Del. Admin. C. § 5304.3.

[107] *See* App. to Opening Br. at A955, A966–67 (No. 93).

[108] *Id.* at A955.

[109] The Hearing Officer expressly ruled that she "did not limit either side's ability to present witnesses and/or testimony to provide Medical coverage in the first part of this fair Hearing." *Id.* at A967.

41

coverage issue. Accordingly, we reject Appellants' challenges to the adequacy of the Fair Hearing.

## 2. *Adequacy of Notice*

Appellants contend that their due process rights were violated because DHSS failed to provide adequate notice of the legal and factual basis for the prohibition of GED treatment. Citing to State regulations, they argue that adequate notice is required even when the change of federal or state law terminates Medicaid services for a class of persons. Appellants cite to the Hearing Officer's statement of the "procedural anomaly" due to DHSS's failure to provide "the standard DDDS letter decision" regarding the forthcoming termination of GED services.[110] They assert that DHSS failed to provide (1) any factual basis for DHSS's October 2013 instruction to JRC to terminate Recipients' GED treatments; (2) any clinical reason for the termination; and (3) any factual basis for the alleged risk of harm to Recipients. Additionally, Appellants contend that DHSS provided no legal or expert support for its actions.

In support of their notice arguments, Appellants rely upon state regulations and *Goldberg*. As to their state law contentions, both parties cite to 16 Del. Admin. C. § 5302(K) but interpret it differently. Section 5302 provides, in relevant part, that "[DHSS] may dispense with timely notice but will send adequate notice not later than the date of action when:"

> (K) When changes in either state or federal laws (e.g., Social Security increases) require automatic adjustments for classes of recipients.

---

[110] *Id.* at A290.

42

These mass change notices *will be timely and adequate*. An adequate notice must include a statement of the:

> 1. Intended action
> 2. Reasons for such intended action
> 3. Specific change in law
> 4. Circumstances under which a hearing may be obtained and assistance continued

The notices will also include:

> 1. The specific change in the individual's benefits
> 2. A name and telephone number of a person to call for additional information. . ..[111]

Section 5302(K) applies to every recipient under any public assistance program administered under DHSS.[112]

DHSS asserts that by letters to JRC and its attorneys, meetings with Appellants, and the Fair Hearing Summary, Appellants received more than adequate notice. DHSS further asserts that Section 5302(K) does not require DHSS to provide detailed reasoning and evidentiary proof to support its policy decisions (i.e., that GED treatment undermines the well-being of Recipients in home and community-based settings).

We first address the factual record relating to notice. DHSS sent notice to JRC on October 8 and 11, 2013.[113] These letters were not addressed to Appellants. But, Appellants have acknowledged that DHSS did provide them with these letters and did meet with Appellants around that same time.[114] Two months later, DHSS filed the Fair Hearing

---

[111] 16 Del. Admin. C. § 5302(K) (emphasis added).

[112] *Id.*

[113] App. to Opening Br. at A14–17 (No. 93).

[114] DHSS contends that DDDS met with the Appellants prior to sending the letters "and explained GED would no longer be covered as part of Medicaid services." Answering Br. at 31. Appellants contend that it was "only after sending its October 2013 letters to JRC did HDSS meet with the

43

Summary while, at the same time, contesting that a Fair Hearing was required (which it was entitled to do pursuant to DSSM § 5307). The HCBS Waiver was amended through formal rulemaking and a public comment process that included public meetings in all three Delaware counties with stakeholders. Further, Appellants did not disagree with the State's statement at argument that there had been significant interaction between the State and Appellants throughout this process as to the CMS polices and HCBS Waiver and their potential impact on Ashlee and Robert. Although Appellants did not have notice in advance of the October 2013 letters to JRC, by the time of the Fair Hearing, Appellants had, in substance, all of the information DHSS was required to provide.

By citing to *Goldberg*, Appellants appear to assert that the notice they received was constitutionally deficient. As stated in *Mathews*, procedural due process requires a balancing of interests.[115] And in *Mullane v. Central Hanover Bank & Trust Co.*, the Supreme Court said that "[t]he notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance . . . ."[116] It stated further that "if with due regard for the practicalities and

---

guardians and provide them with copies of the October 2013 letters to JRC." Reply Br. at 14. During the July 8, 2014 Clarification Conference, DHSS represented that it met with the parents in Delaware "just about at the same time" the October 2013 letters were sent. App. to Opening Br. at A291 (No. 93).

[115] *Mathews*, 424 U.S. at 334–35 (weighing three factors, including the private and government interests affected).

[116] *Mullane*, 339 U.S. at 314 (internal citations omitted).

peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied."[117]

Here, the interests of the parents of Ashlee and Robert is to have electric shock treatment available to be used as a method to control the behavior of their sons. Balanced against their interests is the State's interest in duly enacting regulations prohibiting the use of electric shock in order to safeguard its citizens from what it has deemed to be unacceptable coercive behavior modification practice. If we are also to consider, as *Mathews* suggests, the probable value of additional procedural safeguards to correct what is arguably a defect in the initial notice, we do not think there is any value to reversing and starting over. Appellants, earlier in the proceedings, were asked by the Hearing Officer if they wished to withdraw their hearing request and pursue an appeal of the notice issue and they declined, saying that it would be "prejudicial" to them "to hit the reset button."[118] They did not raise it in their Motion *in Limine* prior to the Fair Hearing or during the Fair

---

[117] *Id.* at 314–15.

[118] Appellants' Opening Br. at 16 (citing App. to Opening Br. at A290 (No. 93)). During this same hearing, namely, the July 8, 2014 Clarification Conference, the Hearing Officer asked Appellants' counsel whether if DDDS withdrew its fair hearing request to pursue an internal appeal on the notice issue. Counsel declined and responded:

> I think at this stage of the game as far down the path as we've gone to a fair hearing, I think it would be prejudicial to hit the reset button and go through a different process since we've already had an exchange of information, a fair hearing summary from the State, engaged in some preparation work and started getting witnesses lined up for a fair hearing, I think that would be prejudicial to my clients to do that.
> . . .
> I mean and, again, I think it ends up putting us right back where we were or where we are now anyway just further down the line.

App. to Opening Br. at A289 (No. 93).

Hearing.[119]  Any prejudice to Appellants has been further mitigated by the fact that there still has been no termination of services, although federal funding has been impacted and the State and Appellants have entered into transition agreements whereby the State has agreed to fund Appellants' services until their transition out of JRC is complete.  Although the State's handling of the notice was not perfect, we agree with the Superior Court that in these highly unique circumstances, it would exalt form over substance to say that Appellants' due process rights were violated.

## B. GED Is Not a Covered Service

In addition to Appellants' procedural and due process challenges, Appellants contend that the Hearing Officer erred in her determination that GED is not a covered service.  They contend that GED aversive interventions are part of a category of covered services and that the State's elimination of them is unreasonable and inconsistent with the stated goals of Medicaid.  The Superior Court concluded that the Hearing Officer's determination that GED was not a covered service was supported by substantial evidence and free from legal error.  We agree.

### 1. GED Is Not Covered Under Federal Law

The Hearing Officer determined "that GED treatment services were no longer covered services by Medicaid under the Delaware HCBS Waiver" based upon "the CMS letters directed to Massachusetts and Delaware" in 2012 and 2015.[120]  The Hearing Officer

---

[119] Consequently, the Hearing Officer did not address the issue of notice in her Final Decision.
[120] *Id.* at A965.

46

determined that the CMS Letters and the Regional I Letter should be afforded "substantial deference."[121] She concluded that "[this] agency interpretation of its own regulation is authoritative" and of "nationwide significance" as the federal law "prohibits the use of electric shock in all community settings."[122] The Superior Court concluded that the CMS Letters and Regional I Letter were "agency interpretation[s] of its own regulation" and thus "entitled to mandatory judicial deference."[123]

Appellants argue that the CMS letters and Regional I letter should not be afforded any deference.[124] They argue that the CMS Letters and Regional I Letter are merely

---

[121] *Id.* at A966.

[122] *Id.*

[123] *Oldham*, 2018 WL 776580, at *5 (internal citations omitted).

[124] Appellants contend that the CMS Letters should not be afforded deference because "'[d]eference is not given . . . to a '*post* hoc rationalization advanced by an agency seeking to defend past agency action against attack' or when there is reason to 'suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" Opening Br. at 40 n.57 (quoting *Massachusetts v. Sebelius*, 638 F.3d 24, 30 (1st Cir. 2011)). Additionally, Appellants argue that the CMS Letters and Regional I Letter should be given only "a modicum of respectful consideration," but no deference because there was no "reference to the specific language of the regulations" at issue and it "offer[ed] little clarity." *Aplin v. McGrossen*, 2014 WL 4245985, at *13, *15 (W.D.N.Y. Aug. 26, 2014). Appellants also assert that the Regional I Letter "'deserve[s] no legal weight'" or "deference because it, and the opinion it expresses, are simply not 'persuasive' even if considered in these proceedings." Opening Br. at 38 (quoting *Kai v. Ross*, 336 F.3d 650, 655 (8th Cir. 2003)). They argue that the Regional I Letter is not an official interpretation and construction of the federal Medicaid statute so it is only entitled to *Skidmore* deference, which means that any deference afforded to the Regional I Letter "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Hearing Officer disagreed with this argument finding that "an agency interpretation of its own regulation is authoritative." App. to Opening Br. at A966 (No. 93). Therefore, the Hearing Officer concluded that the *Skidmore* factors were inapplicable as the CMS Letters and Regional Letter I were not "lacking [the] power to control" as CMS, the agency authorized to promulgate these regulations, "specifically reference[d] GED as a prohibited aversive not covered under the HCBS Waiver" and "clearly mandate[d] [Delaware]" to stop funding "providers" of these [GED] treatments. *Id.* at A966. The

47

guidance letters, not official statements of CMS or the Secretary of HHS, that do not have the force and effect of law.[125]

Federal Medicaid regulations explicitly require assurances from participating states that home and community-based settings protect an individual's rights of privacy, dignity and respect, and freedom from coercion and restraint.[126] CMS construed an individual's freedom from coercion and restraint as prohibiting GED treatment in community settings. Although this Court has stated that "substantial weight and deference is accorded to the construction of a regulation enacted by an agency which is also charged with its enforcement,"[127] we need not today define with precision the level of deference (on the continuum of "no deference" to "mandatory deference") to be given to the CMS Letters.[128] Instead, it suffices that we find no error in the Hearing Officer's decision to give the 2015

---

Hearing Officer concluded that by and through the CMS Letters and Regional I Letter, CMS interpreted "coercion and restraint" to include GED treatment.

[125] *Id.* at A700 (citing *Skidmore*, 323 U.S. at 140); *see* Opening Br. at 37 (citing *Aplin*, 2014 WL 4245985, at *13–14). Notably, the First Circuit held in *Sebelius* that "CMS's interpretation of its regulations resolves this question and is entitled to deference." *Sebelius*, 638 F.3d at 33. It ruled on a CMS guidance letter to Medicaid directors. *Id.* at 33–34.

[126] 42 C.F.R. § 441.530(a)(1)(iii).

[127] *State Farm Mut. Auto. Ins. Co. v. Mundorf*, 659 A.2d 215, 220 (Del. 1995) (internal citations omitted).

[128] *See, e.g.*, *Decker v. Northwest Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) ("When an agency interprets its own regulation, the Court, as a general rule, defers to it 'unless that interpretation is "plainly erroneous or inconsistent with the regulation."'" (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011) (further quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)))). In his partial dissent, Justice Scalia urged reconsideration of the practice of deferring to agencies' interpretations of their own regulations. As he urged, "[m]aking regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its 'special expertise' to formulate the best rule," but "the purpose of interpretation is to determine the fair meaning of the rule—to 'say what the law is.'" *Id.* at 618 (Scalia, J., dissenting in part) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

CMS Letter and Regional I Letter substantial deference.[129]  The Hearing Officer's determination that GED is not a covered service under federal law is supported by substantial evidence and is free from legal error.

In arguing that the medical necessity of their receipt of GED triggers a mandatory duty of DHSS to cover that service—notwithstanding the HCB Settings Rule and CMS's explicit disapproval of GED—Appellants overlook the critical role of CMS in approving the services provided under HCBS waivers.  The statutory basis for Appellants' medical-necessity theory is the so-called "reasonable standards" requirement in the federal Medicaid statute, which provides that "[a] State plan for medical assistance must . . . include reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of" that statute.[130] That language applies only to the State's determination of "the extent of medical assistance," and "medical assistance" is defined under section 1905 of the Social Security Act to include twenty-nine different categories of care.[131]  HCBS, however, are not listed

---

[129] *See Davis v. Shah*, 821 F.3d 231, 247 (2d Cir. 2016) (stating that courts "owe a 'significant measure of deference to CMS's interpretation' of the Medicaid Act," including its "'relatively informal' communications, such as letters from local administers" (quoting *Community Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002))); *Iowa Dep't of Human Servs. v. Centers for Medicare and Medicaid Servs.*, 576 F.3d 885, 888 (8th Cir. 2009) (holding that unless it is plainly erroneous or inconsistent with the regulation, CMS's interpretation of its regulations would be entitled to deference, particularly in a complex and highly technical regulatory program); *Skandalis v. Rowe*, 14 F.3d 173, 178 (2d Cir. 1994) ("An agency's interpretation of a statute that the agency administers is entitled to considerable deference. . . . When an agency construes its own regulations, such deference is *particularly* appropriate." (emphasis added) (internal citations omitted)).

[130] 42 U.S.C. § 1396a(a)(17).

[131] *See* 42 U.S.C. § 1396d(a).

among those twenty-nine different categories, but instead come into play under an entirely different section of the Act: section 1915(c).

Under section 1915(c), the State can provide HCBS as "medical assistance" only to the extent that the services are approved by CMS.[132] Section 1915(c) allows CMS to "by waiver provide that a State plan . . . may include as 'medical assistance' under such plan payment for part or all of the cost of home and community-based services . . . *approved by [CMS].*"[133] The statute further provides that "[a] waiver shall not be granted . . . *unless the State provides assurances satisfactory to [CMS]* that . . . necessary safeguards . . . have been taken to protect the health and welfare of individuals provided services under the waiver."[134] In other words, CMS approval—which CMS cannot grant unless the State provides adequate assurances that it has put in place the necessary safeguards to protect recipients' health and welfare—is needed before the State can provide coverage under an HCBS waiver.

Here, starting in 2014, CMS did not approve Delaware's coverage of GED, and indeed it specifically requested that both Massachusetts and Delaware stop covering GED. That decision had a reasonable basis in the HCB Settings Rule, which requires that each setting "ensure[] an individual's . . . freedom from coercion and restraint."[135] Given that the purpose of GED is to coerce the recipient into ceasing undesirable behavior by applying

---

[132] Technically, section 1915(c) refers to the "Secretary," but that authority has been delegated to CMS.

[133] *Id.* § 1396n(c)(1) (emphasis added).

[134] *Id.* § 1396n(c)(2) (emphasis added).

[135] 42 C.F.R. § 441.301(c)(4)(iii).

50

electric shock whenever they act up, a setting that uses GED can hardly be said to "ensure[]

an individual's . . . freedom from coercion and restraint."

At bottom, Appellants' medical-necessity argument is premised on the notion that

the State's plan lacks reasonable standards. But we cannot fault the State's decision to stop

covering GED as unreasonable when that is what the federal authorities were telling them

to do. If anything, disobeying CMS—which had issued not only letters, but also a binding,

notice-and-comment regulation—would be the unreasonable thing to do. This is not a case

where the State made its decision based on arbitrary criteria such as the cause of the

beneficiary's affliction.[136] Instead, the State based its decision on the uncontroversial

principle that it must follow federal law. Indeed, it is clear that Delaware has sought to

provide coverage to help the Appellants, and only stopped covering the GED treatments

when the federal government said that was impermissible. This is a far cry from the federal

---

[136] We acknowledge that there is federal case law faulting states for denying medically necessary treatment to Medicaid patients based on the reasonable standards requirement. But the animating concern of those cases is to ensure that states do not deny needed treatments to some patients based on arbitrary criteria like the cause of the person's disease, the characteristics of the patient, or empty distinctions between different types of equipment. *See, e.g.*, *White v. Beal*, 555 F.2d 1146, 1151–52 (3d Cir. 1977) (holding that Pennsylvania's limitation of coverage for eyeglasses based on etiology rather than medical necessity violated the reasonable standards requirement, even though eyeglasses are an "optional" benefit); *Lankford v. Sherman*, 451 F.3d 496, 506 (8th Cir. 2006) ("Because Missouri has elected to cover [durable medical equipment] as an optional Medicaid service, it cannot arbitrarily choose which [durable medical equipment] items to reimburse under its Medicaid policy."); *Weaver v. Reagan*, 886 F.2d 194, 197-200 (8th Cir. 1989) (holding that Missouri could not limit coverage of AZT to patients who had specific diagnostic criteria, at a time when AZT was the only AIDS medication available and was medically necessary for some patients who did not meet those diagnostic criteria).

cases cited by Appellants, which have generally involved the denial of services for seemingly arbitrary reasons.[137]

In sum, the State did not violate the reasonable standards requirement in deciding to follow CMS's directives to stop covering GED.

### 2. GED Is Not Covered Under State Law

Appellants contend that the HCBS Waiver is not dispositive of Appellants' Fair Hearing request because the language in the 2014 amendment is (1) a manufactured litigation position taken by DHSS after Appellants filed the Fair Hearing request; and (2) constitutes as an adjudication by DHSS of Recipients' individual rights and not the general rulemaking that DHSS has attempted to make it in form. We reject these contentions.

The Hearing Officer's decision that GED is not a covered service under state law is supported by substantial evidence and free from legal error. In its HCBS Waiver, Delaware expressly incorporated language consistent with CMS's regulation that "[t]he use of averse conditioning, defined as the contingent application of startling, painful or noxious stimuli is prohibited."[138] With the approval of CMS, DHSS enacted this provision into the HCBS Waiver program.

Moreover, at the DHSS level, the incorporation of the HCBS Waiver language satisfied its procedural requirements by process of notice, comment, and public hearing. The HCBS Waiver was duly enacted. The Hearing Officer properly concluded that

---

[137] *See, e.g.*, *Lankford*, 451 F.3d at 506.

[138] App. to Opening Br. at A503 (No. 93).

because the HCBS Waiver was duly enacted and approved by CMS on July 1, 2014, it carries the force and effect of law. Appellants did not challenge the lawfulness of that waiver.[139] The waiver unquestionably bans GED and has the force of law. In sum, the Hearing Officer's determination that GED is not a covered service under federal and state law was supported by substantial evidence and free from legal error.

*C. Americans with Disabilities Act Claim Was Not Properly Raised*

Finally, we agree with DHSS that Appellants' ADA claim was not fairly presented below.[140]

*VI. Conclusion*

For the reasons set forth above, we AFFIRM.

---

[139] Appellants could have challenged the amendments to Delaware's HCBS Waiver pursuant to 29 *Del. C.* § 14141 but did not.

[140] Supr. Ct. R. 8.