IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NIHAR BHAVESH GALA, | § | |
| | § | No. 173, 2020 |
| Appellant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. S19A-06-002 ESB |
| JEFFREY W. BULLOCK, in his official | § | |
| capacity as SECRETARY OF STATE, | § | |
| | § | |
| Appellee Below, | § | |
| Appellee. | § | |

| | | |
|---|---|---|
| NIHAR BHAVESH GALA, | § | |
| | § | No. 174, 2020 |
| Appellant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. S19A-05-002 CAK |
| BOARD OF MEDICAL LICENSURE | § | |
| AND DISCIPLINE OF THE STATE OF | § | |
| DELAWARE, | § | |
| | § | |
| Appellee Below, | § | |
| Appellee. | § | |

Submitted: January 27, 2021
Decided: April 1, 2021

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED**.

Benjamin A. Schwartz, Esquire, Gwendolyn M. Osborn-Gustavson, Esquire, Schwartz & Schwartz, Dover, Delaware for Appellant.

Patricia A. Davis, Esquire, Deputy State Solicitor, Dover, Delaware for Appellees.

**VALIHURA**, Justice:

This is an appeal from a decision of the Delaware Superior Court affirming decisions by the Secretary of State (the "Secretary") and the Delaware Board of Medical Licensure and Discipline (the "Board") to revoke Dr. Nihar Gala's ("Gala") medical license and controlled substance registration ("CSR"). The Delaware Superior Court upheld the Board's and Secretary's decisions after finding that substantial evidence existed to support the issued discipline.[1]

Gala appeals the Superior Court's decision on three grounds. *First,* Gala argues that the Board's decision to deliberate "behind closed doors" rendered the record incomplete for judicial review. *Second*, Gala argues that the Board and the Secretary were biased. *Third,* Gala argues that the Board's and the Secretary's decisions to revoke his medical license and CSR are not supported by substantial evidence. For the following reasons, we hold that the decisions by the Board and Secretary are supported by substantial evidence and are free from legal error. Accordingly, we AFFIRM the decision of the Superior Court.

## I.      *Relevant Facts and Procedural Background*

### 1. *The Parties*

The Appellant, Dr. Nihar Gala ("Gala"), was a Delaware board-licensed physician and controlled substance registrant. At the relevant times, Gala was employed as a physician at the Delaware-based "Got-a-Doc" medical clinics where he engaged in the

---

[1] *Gala v. Delaware Bd. of Med. Licensure & Discipline*, 2020 WL 2111372, at *9 (Del. Super. May 1, 2020).

2

practice of pain management and addiction treatment.[2]

The Appellee, Jeffrey W. Bullock, appears in his official capacity as the Secretary. The General Assembly has charged the Secretary with regulating the registration and control of the manufacturing, distribution, and dispensing of controlled substances within the State of Delaware.[3]  Accordingly, Delaware physicians must obtain a CSR from the Secretary to be able to prescribe patients controlled substances for treatment.[4]

The Controlled Substance Advisory Committee (the "Committee") is the designee of the Secretary, whose objective is to protect the public health, safety, and welfare by regulating and monitoring the use of controlled substances.  The Committee also "makes recommendations to the Secretary of State of new or amended controlled substance regulations and disciplinary actions of registrants who violate the law."[5]

Co-Appellee, the Board, serves as the regulatory and disciplinary body for the practice of medicine in the State of Delaware.  Accordingly, the Board is tasked with disciplining physicians for unprofessional conduct.[6]

---

[2] "Got-a-Doc" at that time was owned and managed by Dr. Zahid Aslam.  Dr. Aslam was later convicted in an unrelated federal criminal action for making false statements to a financial institution.  *See generally United States v. Aslam*, 2020 WL 4501917 (D. Del. Aug. 5, 2020) (granting Dr. Aslam compassionate early release).

[3] 16 *Del. C.* §§ 4731–33.

[4] 16 *Del. C.* § 4732(a).

[5] 24 *Del. Admin C.* § UCSAR-1.1 [hereinafter "Controlled Substance Reg."].

[6] 24 *Del. C.* § 1710(a).

Non-party S.G. is Gala's former patient.[7]  Gala's treatment of S.G. gives rise to this appeal.

### 2. *S.G.'s First Appointment with Gala*

On September 23, 2016, S.G. went to a Got-a-Doc medical clinic to receive treatment from Gala for her chronic pain.  During the initial consultation, S.G. informed Gala that she had a history of opioid addiction and was currently taking Suboxone.[8]  Notwithstanding this disclosure, Gala prescribed S.G. Oxycodone without reviewing her prior medical records or discussing the relevant risks and benefits associated with opioid treatment.[9]  He did not make a diagnosis or physical findings.  Nor did he first opt for treatment with non-opioids.  He asked her for her cell phone number in case there was a "problem with prescriptions."[10]  Gala gave S.G. his personal cell phone number.

Within a day of the first appointment, S.G. called Gala asking for his help in getting her prescription covered by Medicaid.  Over the next few days, S.G. and Gala exchanged a series of texts, and Gala eventually asked S.G. to "come hang out."  S.G. declined that invitation.

---

[7] App. to Am. Opening Br. at A329 (Recommendation to the Board) [hereinafter "A___"].

[8] *Id.*; First Am. App. to First Am. Ans. Br. at B71 (Excerpts from the Evidentiary Hearing) [hereinafter "B___"].  Suboxone is "a pain medicine" that "also blocks the effects of other opioids that the patient might be taking so that it decreases withdrawal and decreases the craving for the use of other opioids." B12.

[9] A329 (Recommendation to the Board); B13–14, B37, B84–85 (Excerpts from the Evidentiary Hearing).  The General Assembly has classified Oxycodone as a Schedule II controlled substance in the State of Delaware.  16 *Del. C.* § 4716(b)(1).  This means it has a high potential for abuse, is approved for medical use only with severe restrictions, and its abuse may lead to severe psychic or physical dependence.  16 *Del. C.* § 4715.

[10] A332.

### 3. S.G.'s Second Appointment with Gala and the Start of Their Sexual Relationship

The night before S.G.'s second appointment, S.G. received a strange text message from Gala reading, "I can give you special care." Confused by the message, S.G. and Gala spoke over the phone where Gala informed S.G. that he could give her a higher dosage of Percocets.

On October 20, 2016, S.G. had her second appointment with Gala. During this appointment Gala renewed her Oxycodone prescription and added a thirty-day supply of Fentanyl patches.[11]

Later that day, Gala asked S.G. to meet in a Royal Farms parking lot. At Gala's request, S.G. got into Gala's car and performed oral sex on him as he drove around. S.G. and Gala's sexual relationship continued for several months, where S.G. would go to Gala's house and have sex with him in exchange for pills, including Vicodin, Morphine, Oxycodone, and Percocets.

### 4. S.G.'s Third Appointment with Gala and Additional Prescriptions

On October 28, 2016, S.G. had her third appointment with Gala. This was S.G.'s last documented and scheduled visit with Gala. During this appointment, Gala refilled S.G.'s Oxycodone prescription, prescribed her Oxycontin, and advised her to discontinue her Fentanyl prescription.

---

[11] B77; A330 (Recommendation to the Board). Like Oxycodone, note 9 *supra*, the General Assembly has classified Fentanyl as a Schedule II controlled substance. 16 *Del. C.* § 4716(c)(6). It also has a high potential for abuse, is approved for medical use only with severe restrictions, and its abuse may lead to severe psychic or physical dependence. 16 *Del. C.* § 4715.

In November 2016, Gala wrote S.G. prescriptions for opioids on two separate occasions without corresponding office visits. On November 9, 2016, Gala prescribed S.G. "90 tabs of Oxycodone 20mg IR."[12] On November 30, 2016, he prescribed S.G. "Dilaudid 4mg tabs every six hours for 30 days at 120 tabs."[13] Despite authorizing these medications, there was no documentation in Gala's charting for S.G. showing the medical justifications for the prescriptions or of the attendant circumstances.

5. *Investigation into Gala*

On December 19, 2016, S.G. broke off the arrangement with Gala and reported him to at least two other Got-a-Doc employees, and later to the police. The day she confided in them, the Got-a-Doc employees filed a report against Gala with the Division of Professional Regulation.[14] After Gala learned of S.G.'s December 19 disclosures, he told S.G. that her disclosures would cause "big trouble" for her.[15]

In October 2018, the Delaware Department of Justice ("DOJ") filed complaints against Gala with the Board and the Secretary. The DOJ complaint filed with the Board

---

[12] A330. The documentation for the prescription is dated November 6, a Sunday. A284. Gala testified that the note should have referred to November 9, 2016 and contains a typographical error on his part. B80 (Excerpts from the Evidentiary Hearing). However, he agreed there was no patient record for either November 6 or November 9. *Id.*

[13] A330 (Recommendation to the Board).

[14] B1–2 (Initial Complaint Filed with the Division of Professional Regulation). The Division of Professional Regulation "oversees numerous state agencies, boards, and commissions, including the Board of Medical Licensure and Discipline, of which the Director of the Division is a voting member." *Del. Bd. of Med. Licensure & Discipline v. Grossinger*, 224 A.3d 939, 953 n.110 (Del. 2020); *see also* 29 *Del. C.* § 8735 (setting forth the powers, duties, and functions of Division of Professional Regulation).

[15] A335 (Recommendation to the Board).

6

alleged that Gala had violated six subsections of the Delaware medical professionalism statute and numerous Board regulations.  The DOJ complaint filed with the Committee and the Secretary alleged that he had violated four controlled substance statutes.  Because the two complaints addressed the same factual circumstances, they were consolidated into a single administrative hearing.

6.  *Gala Introduces a New Set of Medical Records for S.G.*

In October of 2018, Gala produced to his attorney a set of comprehensive records detailing S.G.'s treatment.[16]  Gala testified that the new records were S.G.'s contemporaneous medical records, and the records produced by Got-a-Doc were fraudulently created as part of a conspiracy against him.  The State was unable to forensically confirm the creation date of the new records, as Gala testified that he had delivered the laptop to some unidentified person in India who in turn "extrapolated" the records and sent them to Gala in encrypted form.  Gala was unable to produce any evidence confirming the authenticity of the records, as Gala testified that the laptop had since been destroyed.[17]

---

[16] A5–28 (Medical Records for S.G. provided by Gala).  The State's expert witness noted a number of suspicious features of these later-provided notes, including entries recording dates in September 2018 instead of September 2016.  B26, B86 (Excerpts from the Evidentiary Hearing).

[17] A235 (Recommendation to the Board); *see also* A327–28 ("[Gala] offered no 'paper trail' to document the travel of the device, nor the identity of the person in India whom he had asked to assist him. . . there is no proof in the form of receipts or emails or discs or thumb drives that the alleged extrapolation was performed in India.").

7

### 7. *The Hearing Officer's Recommendation*

A hearing officer received sworn testimony and other evidence during the period March 11–15, 2019. Following a review of the evidence, the Hearing Officer issued recommendations to the Board and to the Committee, respectively (collectively, "Recommendations"). The Recommendations contained findings of fact and conclusions of law that Gala failed to maintain proper treatment records, that the records produced from India were falsified, and that S.G. was a credible witness whose story was consistent.[18] Further, the Recommendations stated that S.G. became an "unwitting psychological hostage" to Gala's "repetitive and bizarre and dehumanizing sexual demands."[19]

The Recommendations contained conclusions of law that Gala's treatment of S.G. violated various subsections of the Delaware statute relating to unprofessional conduct in the practice of medicine as well as several subsections of the statute for discipline of CSR registrants. Specifically, the Hearing Officer determined that Gala had violated six provisions of the Medical Practice Act, namely, 24 *Del. C.* §§ 1731(b)(1), 1731(b)(2),

---

[18] A326 (finding that the purported documentation from India "was not prepared by Dr. Gala simultaneous with the medical care which it purports to document"); A328 (finding that the documentation was instead created responsively to the State's expert report in "an attempt by Dr. Gala to anticipate the prosecution of this case"); A330 (at the first visit, Gala "did not make a diagnosis, nor physical findings," and "[i]n addition to the prescribing documented at the time of the above office visits, Dr. Gala also prescribed other medications for S.G. which were not documented as having been provided to her in conjunction with documented office visits. . . there is no documentation in Dr. Gala's charting for S.G. of the medical justifications for the prescriptions, nor documentation of the circumstances of having written those scripts."); A333 (finding that S.G. was "a generally credible witness. With the exception of a few minor details, her story remained consistent from the time of her first disclosures at Got-a-Doc in December 2016 until her hearing testimony. . .").

[19] A356.

1731(b)(3), 1731(b)(6), 1731(b)(11), and 1731(b)(17)[20] as well as various Board Regulations.[21] The Hearing Officer also determined that Gala had violated four subsections of the controlled substances statutes.[22] Consequently, the Recommendations suggested that the Board and the Secretary permanently revoke Gala's medical license and CSR. The Recommendations were circulated to the parties.

---

[20] Those provisions pertain to the use of any fraudulent, deceitful, dishonest, or unethical practice in connection with the practice of medicine (24 *Del. C.* § 1731(b)(1)); conduct that would constitute a crime substantially related to the practice of medicine (24 *Del. C.* § 1732(b)(2)); any dishonorable, unethical, or other conduct likely to deceive, defraud, or harm the public (24 *Del. C.* § 1731(b)(3)); the use, distribution, or issuance of prescriptions for a dangerous or narcotic drug for other than a therapeutic or diagnostic purpose (24 *Del. C.* § 1731(b)(6)); gross negligence or a pattern of negligence in the practice of medicine (24 *Del. C.* §1731(b)(11)); and, a violation of Board regulations which more probably than not will harm or injure the public or an individual (24 *Del. C.* § 1731(b)(17)). *See also* A354 (Recommendation to the Board) (reviewing the Board's "parameters" for violations of 24 *Del C.* §§ 1731(b)(1–3), 1731(b)(6), 1731(b)(11), and 1731(b)(17), "the violations proven in this case.").

[21] The Board's regulations provide detail on the definition of "dishonorable or unethical conduct" referenced in Section 1731(b)(3) of the Medical Practice Act, defining it to include exploiting the doctor/patient privilege for sexual gratification (24 *Del. Admin C.* § 1700-8.1.2 [hereinafter "Bd. Reg."]); engaging in sexual impropriety (Bd. Reg. 8.1.3); failing to comply with Board Regulations governing the use of controlled substances for the treatment of pain (Bd. Reg. 8.1.12); failing to adequately maintain or properly document patient records (Bd. Reg. 8.1.13), and acts tending to bring discredit upon the profession (Bd. Reg. 8.1.16). Board Regulation 18.0 governs the use of controlled substances for the treatment of pain, and is intended to minimize the occurrence of practices that deviate from the appropriate standard of care and lead to abuse and diversion.

[22] The four controlled substance statutes concerned failing to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels (16 *Del. C.* § 4735(b)(1)); failing to comply with applicable federal, state, or local law (16 *Del. C.* § 4735(b)(2)); violating a rule of the Secretary related to controlled substances (16 *Del. C.* § 4735(b)(6)); and, engaging in conduct the Secretary finds to be relevant and inconsistent with the public interest (16 *Del. C.* § 4735(b)(8)).

9

*8. Gala Files Exceptions to the Recommendations*

On May 1, 2019, Gala's counsel submitted Exceptions to the Hearing Officer's Recommendation with the Board. On May 6, 2019, Gala submitted Exceptions to the Hearing Officer's Recommendation to the Committee (collectively, "Exceptions").[23]

In the Exceptions, Gala's counsel challenged the Recommendation to the Board on the following grounds: (1) the Hearing Officer failed to conduct a proper mitigating factor analysis, (2) the reference in the Recommendations to S.G. as a "psychological hostage" violated Gala's due process rights, (3) the charges relating to the falsification of medical records were a violation of Gala's due process rights as he was not given proper notice to defend against them, and (4) the Recommendations mischaracterized Gala's counsel's zealous representation as victimizing S.G.

In the Exceptions to the Committee, Gala asserted that (1) the Committee's and the Secretary's decision should be stayed until the Board ruled, (2) they should reject the Recommendations for the same reasons as he argued the Board's Recommendations should be rejected in those Exceptions, and (3) some of the Hearing Officer's findings should be rejected for procedural reasons or because they do not justify discipline.

*9. The Board and the Secretary Issue Final Orders Revoking Gala's Medical License and CSR*

The Board held a hearing and deliberated on the Recommendations and the Exceptions on May 7, 2019. The Board issued its Final Order on June 4, 2019. The Board

---

[23] A483–89 (Exceptions to the Recommendations to the Board); A502–505 (Exceptions to the Recommendations to the Committee).

10

noted that it was bound by the Hearing Officer's factual findings, but nevertheless rejected the Hearing Officer's characterization of S.G. as Gala's "psychological hostage." The Board rejected the Hearing Officer's conclusion of law that fabricating the false treatment records was a sanctionable instance of unprofessional conduct, since that accusation had not been included in the Complaints. The Board otherwise accepted the Hearing Officer's recommended conclusions of law. Characterizing Gala's actions as "inexcusable" and showing a "flagrant disregard for the Delaware law [sic] and the Board's Regulations," the Board ordered his medical license permanently revoked.

On May 22, 2019, the Committee deliberated on the Hearing Officer's recommendation and Gala's Exceptions, and it issued a recommendation to the Secretary that Gala's CSR be revoked. On June 18, 2019, the Secretary issued a Final Order revoking Gala's CSR.[24] In the Final Order, the Secretary explained that the decision was a consequence of Gala's "repeated and egregious" inappropriate prescribing practices contravening the regulations governing the prescribing of controlled substances, and his abuse of his CSR authority in his relationship with S.G.[25] The Secretary reviewed a variety of state and federal laws and regulations for controlled substances, and discussed how Gala had violated them based upon the facts found by the Hearing Officer. The Secretary did not use the fabrication of medical records finding as the basis for any violation of law or regulation, but noted that Gala's behavior in that regard was an important consideration in

---

[24] Am. Opening Br. Tab B (Secretary's Final Order).

[25] *Id.* at 4.

11

weighing Gala's credibility. The Secretary ordered Gala's CSR permanently revoked.

### 10. Gala Appeals the Disciplinary Sanctions to the Superior Court

Following the discipline issued by the Board and the Secretary, Gala timely appealed the decisions to the Delaware Superior Court, which consolidated them for purposes of briefing and argument. In its analysis, the Superior Court first addressed Gala's argument that the Recommendations violated Gala's due process rights by finding that Gala had falsified medical records, and that S.G. was a "psychological hostage." The Superior Court rejected this argument, explaining that the Recommendations of the Hearing Officer are not case decisions, and, therefore, are not subject to judicial review under the Delaware Administrative Procedures Act ("APA").[26] Thus, the Superior Court concluded that only the Final Orders issued by the Board and the Secretary were subject to its review. When reviewing the Board's Final Order, the court determined that the Board had cured any legal error by expressly rejecting those challenged findings in its Final Order. The Superior Court similarly concluded that the Secretary's Final Order was free from legal error, as the Final Order established that the Secretary did not rely on the allegedly improper findings in revoking his license.

The Superior Court next examined whether substantial evidence existed to support the Board's and Secretary's sanctions against Gala. Following a review of the record, it determined that substantial evidence existed to support the Board's and the Secretary's findings and conclusions that Gala's prescribing practices and relationship with S.G. were

---

[26] *Gala*, 2020 WL 2111372, at *5–6 (quoting *Quaker Hill Place v. Saville*, 523 A.2d 947, 952 (Del. Super. 1987)) (citing 29 *Del. C.* § 10126(a)).

12

improper.

Finally, the Superior Court rejected Gala's argument that the sanctions were too severe, as it concluded that the Board and the Secretary exercised proper discretion as their discipline was supported by substantial evidence and was within the bounds of their statutory authority. The Superior Court affirmed the Secretary's and Board's Final Orders.

*11. Contentions on Appeal in this Court*

Gala timely appealed the Superior Court's decision affirming both Final Orders to this Court. Following a joint request from the parties, this Court consolidated both matters for briefing purposes. On appeal, Gala raises three arguments.

*First*, Gala asserts for the first time in these proceedings that the Board violated his due process rights by failing to create a complete record for judicial review by deliberating on the Recommendations "behind closed doors." *Second*, Gala asserts that the Board and the Secretary failed to act as impartial fact finders by allowing "inflammatory" and unsupported remarks to taint their reviews of Gala's case. *Third,* Gala argues that the Board's and the Secretary's Final Orders were not supported by substantial evidence.

## II. Standard of Review

Regarding appeals from administrative agencies where the Superior Court did not receive any evidence other than that presented to the agency, "we do not review the Superior Court's decision directly" but instead "examine the agency's decision to determine whether the agency's ruling is supported by substantial evidence and free from

13

legal error."[27]  Questions of law are reviewed *de novo*.[28]

## III.  Analysis

### 1. Gala's Board Deliberation Argument Fails Procedurally and Substantively

Gala argues that the Board violated his due process rights and its statutory obligations by deliberating off the record.  Gala asserts that the record is incomplete for the purposes of judicial review, as his filing of the Exceptions "triggered the protections of § 10125(d)" of the APA, which requires the agency to maintain a verbatim transcript of all hearings.[29]

In response to Gala's arguments, the Secretary and Board point out that Gala advances this argument for the first time in his opening brief on appeal.  As to the merits of Gala's argument, they state that Gala's interpretation of § 10125(d) is misguided, as the Delaware APA does not require agencies to deliberate on the record, that the Board has separate statutory authority to deliberate in "executive session," and that, in any event, Gala fails to articulate any prejudice he suffered even if he had been entitled to public deliberation with a transcript.

We hold that Gala has waived any argument related to the Board failing to deliberate on the record.  The Delaware Supreme Court will only review questions that are fairly

---

[27] *Grossinger*, 224 A.3d at 951 (citing *Stoltz Mgmt. Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del. 1992)); *see also Prunckun v. Del. Dep't. of Health & Soc. Servs.*, 201 A.3d 525, 539–40 (Del. 2019).

[28] *Prunckun*, 201 A.3d at 540.

[29] Am. Opening Br. at 13 (quoting *Richardson v. Bd. of Cosmetology & Barbering*, 69 A.3d 353, 358 (Del. 2013)).

presented to the trial court.[30] In his briefing before the Superior Court, Gala failed to fairly raise this issue.[31] Although the trial transcript from the Superior Court shows that Gala's counsel mentioned that the Board conducted executive deliberations, Gala's counsel did not argue that this procedure was improper, rather he merely expressed his desire to have the transcripts from the deliberation available to press his assertion that the Board was biased.[32]

But even if we were to consider Gala's argument on its merits, we would reject it. The Medical Practice Act provides that "[a] hearing on a complaint conducted by a hearing panel or examiner is open to the public, *except the Board may conduct executive session for deliberations and purposes permitted by § 10004 of Title 29* [the APA]."[33] Further, the Medical Practices Act provides that the hearings "shall be conducted pursuant to [the APA]."[34] Thus, the General Assembly has provided that the APA will govern disciplinary

---

[30] Del Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review. . ."); *see also Weller v. Morris James LLP*, 2021 WL 813002, at *1 (Del. 2021) ("Absent plain error, which we do not find here, the Court will not consider the arguments that the appellant makes for the first time on appeal."); *Mammarella v. Evantash*, 93 A.3d 629, 638 n. 34 (Del. 2014); *Del. Elec. Coop., Inc. v. Duphily*, 703 A.2d 1202, 1206 (Del. 1997) ("It is a basic tenet of appellate practice that an appellate court reviews only matters considered in the first instance by a trial court.").

[31] The Superior Court noted that, other than "editorializing by the Hearing Officer and the allegation of falsifying medical records . . . Gala asserts no errors in the procedures that were followed by the Hearing Officer, the Board, the Committee and the Secretary under the applicable statutes and regulations." *Gala*, 2020 WL 2111372, at *9.

[32] *See* A549 (Transcript of Superior Court Proceeding) ("You know, I thought about this and I wish that we had the transcripts. You know, the Board went into executive session to deliberate on this, so we don't have a transcript of the Board deliberation.").

[33] 24 *Del. C.* § 1734(b) (emphasis added).

[34] 24 *Del. C.* § 1734(i).

15

hearings like Gala's as a general matter, but it has specifically provided that the Board may deliberate in private.[35]

## 2. The Board and the Secretary Were Not Biased

Gala presents a two-fold argument that the Board and the Secretary violated his due process rights by failing to act impartially. First, Gala contends that the Board and the Secretary improperly relied upon the Hearing Officer's findings that Gala falsified medical records, and that S.G was a "psychological hostage."[36] Second, Gala contends that the Board demonstrated bias in favor of the State because a member of the Board requested Gala's counsel to "wrap it up" during arguments.[37]

A professional license is considered property that is afforded protection under the

---

[35] The APA distinguishes between two categories of agency action: "agency regulations" and "case decisions." *Free-Flow Packaging Int'l, Inc. v. Sec'y of the Dept. of Nat. Res. & Env't Control*, 861 A.2d 1233, 1236 (Del. 2004) (citing 29 *Del. C.* § 10102(2)). The transcript requirement for public hearings on agency regulations includes the provision that "[n]o part of the public hearing is exempt from this record requirement." 29 *Del. C.* § 10117(2). By contrast, regarding case decisions, "[a] record from which a verbatim transcript can be prepared shall be made of all hearings in all contested cases," but there is no language requiring *all* parts of the hearing to be on the record. 29 *Del. C.* § 10125(d). In *Mancus v. Merit Employee Relations Board*, the Superior Court observed that the APA "provides different rules regarding the creation of a record for the different categories." 2019 WL 480040, at *4 (Del. Super. Feb. 1, 2019). It held that "Section 10125(d) does not contain language that requires all parts of the hearing to be on the record, as opposed to the language in § 10117(3) . . . ." *Id.* As the Superior Court observed, "[c]ase decisions are different, and the Court will turn to the [agency's] own procedural rules for further clarification on the proper procedure for the instant underlying case decision." *Id.* at *5. Because the agency followed its own procedural rules in that case, which expressly permitted it to deliberate off the record, the court found no error of law. *Id.* at *6.

[36] Am. Opening Br. at 17.

[37] *Id.* at 16; A506 (Excerpt from the Board Hearing).

16

due process clause of the Fourteenth Amendment to the United States Constitution.[38] The right to a fair trial before an impartial tribunal is a fundamental principle of due process that applies to courts and administrative agency proceedings alike.[39]

### a. The Board Cured Any Legal Errors Committed by the Hearing Officer

We hold that the challenged findings of the Hearing Officer do not provide Gala a basis for relief. The Board is bound by a hearing officer's findings of fact, but it has the discretion to consider a party's exceptions as to conclusions of law and recommended penalties.[40]

In this case, the Board expressly chose not to adopt the Hearing Officer's characterization of S.G. as a "psychological hostage," concluding that such a characterization was a 'diagnosis' outside the Hearing Officer's expertise.[41] As to the charge of fabricating medical records, the Board "reject[ed] the recommended conclusion of law of the hearing officer that Dr. Gala violated 24 *Del. C.* § 1731 (b)(1) by falsifying

---

[38] *Sokoloff v. Bd. of Med. Practice*, 2010 WL 5550692, at *5 (Del. Super. Aug. 25, 2010); *Villabona v. Bd. of Med. Practice*, 2004 WL 2827918, at *6 (Del. Super. Apr. 28, 2004) *aff'd* 858 A.2d 961, 2004 WL 1965436 (Del. Aug. 23, 2004).

[39] *Sullivan v. Mayor of Elsmere*, 23 A.3d 128, 135 (Del. 2011); *see also Home Paramount Pest Control v. Gibbs*, 953 A.2d 219, 222 (Del. 2008) (requiring neutrality and the appearance of neutrality from an administrative agency hearing officer as measured by the standard applied to judicial officers set forth in *Los v. Los*, 595 A.2d 381, 383–85 (Del. 1991)); *Quaker Hill Place*, 523 A.2d at 967 ("In performing its duties under the Equal Rights to Housing Act, the [State Human Relations] Commission is statutorily compelled to act with fairness and due process for all parties concerned. It is axiomatic that this obligation derives from the due process mandates of the Delaware Constitution.") (italics removed) (internal citations omitted).

[40] 29 *Del. C.* § 8735(v)(1)(d).

[41] *See* Opening Br. Tab A, at 6 (Final Board Order) ("The Board rejects the hearing officer's characterization of S.G. as a 'psychological hostage' *insofar as this diagnosis is outside of the hearing officer's expertise*.") (emphasis added).

medical records."[42]  It concluded that "[b]ecause falsifying medical records was not pled in the complaint, Dr. Gala was not adequately on notice that he would have to defend against this allegation."[43]  The Board, therefore, cured any legal error resulting therefrom.

Nor did the Secretary's Final Order rely on the challenged findings.  The Secretary's Final Order expressly provided that the Hearing Officer's conclusion that Gala had falsified medical records "went to the issue of Dr. Gala's credibility," but it did not otherwise consider that conclusion in determining Gala's discipline.  Further, the Secretary stated that the revocation of Gala's CSR was a result of Gala's improper prescribing practices and his unethical relationship with S.G.  The Secretary did not refer to the Hearing Officer's "psychological hostage" characterization.

In affirming the Secretary's and Board's orders, the Superior Court stated with respect to the "psychological hostage" characterization that, "[l]ike the Board and the Secretary below, I disregard these characterizations as they are beyond the scope of the Hearing Examiner's mandate and expertise."[44]  It added that, "[t]hey did not underpin the Orders, and they play no part in my decision here."[45]  It made a similar statement as to the falsification of medical records finding.[46]

---

[42] *Id.*

[43] *Id*.

[44] *Gala*, 2020 WL 2111372, at *4.

[45] *Id*.

[46] *Id*.

18

In *Bilski v. Board of Medical Licensure & Discipline*[47] the Superior Court held that, although an agency is bound to a hearing officer's findings of fact, an agency can cure legal errors from improper recommendations made by a hearing officer if the agency expressly rejects the improper recommendations in the agency's final order. There, a doctor appealed a Board decision on the grounds that the hearing officer improperly relied upon a policy that had not yet taken effect. In rejecting the argument, the Superior Court correctly observed that it was the Board's decision, and not the Hearing Officer's recommendation, that was subject to its appellate review. The Superior Court then held that any legal error stemming from the hearing officer's reliance on the policy was cured by the Board expressly stating in its final order that the policy was not considered when deciding the appellant's discipline. This Court affirmed that decision. Here we similarly reject Gala's bias claims which are premised upon findings appropriately disregarded by both the Board and Secretary.

### b. *Gala's Due Process Rights Were Not Otherwise Violated*

Gala also contends that his due process rights were violated when a member of the Board at the hearing requested of Gala's counsel, "for the sake of time, can you please wrap it up, please?"[48] Gala was afforded a full hearing on his Exceptions before the Board where he was represented by counsel, and where counsel was able to fully introduce all of

---

[47] 2014 WL 3032703, at *7 (Del. Super. June 30, 2014), *aff'd.* 115 A.3d 1214, 2015 WL 2452821 (Del. May 20, 2015).

[48] A506 (Excerpt from the Board Hearing).

19

his arguments as to why the Hearing Officer's Recommendations should not be accepted.[49]

Administrative officials must conduct proceedings with impartiality and proper decorum. But litigants should be mindful that adjudicating bodies are entitled to impose reasonable limitations on the length of proceedings as judicial resources must be efficiently and effectively used.[50] Gala points to no argument or evidence which the Board prevented him from presenting, and no authority by which such a request, standing alone, could be construed as demonstrating bias. Absent such evidence, Gala's due process argument fails.[51]

---

[49] Gala submitted only the single page of the transcript containing this "wrap it up" remark with his Opening Brief. *Id*. Yet even this single page shows that the Board permitted Gala to articulate his arguments in full. Immediately after the challenged remark, Gala's attorney led into his next argument by characterizing it as Gala's "last exception." *Id*. The State also submitted a single page from the transcript. B106 (Excerpt from the Board Hearing). The State's excerpt shows that when he finished that argument, Gala's attorney concluded:

> Those are our exceptions. Thank you for hearing me out. I'm sorry I took so long.
> By lawyers' standards, I was actually brief, but I appreciate your consideration.

These excerpts, brief as they are, demonstrate that the Board permitted Gala to present his arguments and Exceptions in full.

[50] *See Kowalski v. Unemployment Ins. Appeal Bd.*, 1990 WL 28597, at *6 (Del. Super. Jan. 22, 1990). In *Kowalski*, a claimant appealed a decision from the Unemployment Insurance Appeal Board arguing that its members violated his due process rights by "badgering" the claimant about time limits. The court rejected this argument and found that no due process violations occurred as the claimant was permitted to introduce all evidence and raise all relevant arguments. *Id*. at *8 ("Unless such interruptions prevent claimants from presenting relevant evidence, which would be a denial of due process, it is not for this Court to require the Board to change the manner in which the proceedings are conducted.").

[51] Gala also contends that the transcript of the Committee's deliberations "reveals that the majority of the committee's members went in with minds made up to accept not just the Hearing Officer's conclusions of fact, but also his conclusions of law and recommended discipline." Am. Opening Br. at 18. Gala asserts that the Committee "did not discuss the significance of the Due Process violations on the recommended discipline." *Id*. The record simply does not support Gala's claim of bias. Gala's disparagement of the Committee's rigor is conclusory. Nor is it adequately supported by the three-page excerpt he included in the record before this Court. A507–09 (Excerpt from the Committee Hearing). Even in this short excerpt, the Committee members discuss

### 3. *The Final Orders Are Supported by Substantial Evidence*

Finally, Gala argues that substantial evidence does not exist to support the most serious factual findings made by the Board and Secretary. Gala raises two broad challenges. First, he asserts that the Got-a-Doc records lacked sufficient indicia of reliability and a reasonable mind could not accept them as adequate support for the Board's conclusions because they were falsely created by Got-a-Doc's other physicians to destroy his reputation and competing medical practice.[52] Second, he argues that the State did not present substantial evidence to establish that Gala engaged in an abusive or coercive sexual relationship with S.G., and that the evidence it did present supports only an inference that any alleged sexual relationship "was not only consensual but actively desired by S.G."[53]

Because he claims that, in combination, these findings form the basis of "nearly every finding of a Board violation," the Final Orders are fundamentally erroneous. Accordingly, rather than focusing just on Gala's two specific challenges, we address broadly whether the Board's and Secretary's findings are supported by substantial

---

possible alternative sanctions. A508. They discuss whether Gala's prescribing practices alone justify revocation, if they were to hypothetically trust the Board to adequately discipline Gala over his sexual relationship with S.G. A507. They discuss whether permanent revocation is appropriate in light of Delaware's critical need for pain management providers. *Id.* Even those Committee members arguing for imposing the hearing officer's recommended sanction were not doing so uncritically, but instead consistently articulating with particularity how that proposed penalty fit within the Committee's mandate to safeguard the public health, safety, and welfare. A507, A509.

[52] We note that the Hearing Officer concluded his factual findings by finding that "the evidence is non-existent or so sparse in this case as not to lead to a logical inference that Dr. Aslam was leading a crusade to ruin Dr. Gala." A336 (Recommendation to the Board). Further, "[a]ccording to the record, no witness in this case (including S.G.) was offered money or any other form of inducement by anyone to testify against Dr. Gala or to falsely testify." *Id.*

[53] Am. Opening Br. at 3.

21

evidence. Violations subject to the Board's discipline are "unprofessional conduct" under

24 *Del. C.* § 1731 ("Section 1731"), whereas the Secretary's disciplinary authority is vested

by 16 *Del C.* § 4735 ("Section 4735"). As such, we group discussion of Gala's violations

as they relate to: (i) Gala's improper prescribing practices, and (ii) Gala's unethical

relationship with S.G.

### a. The Final Orders Disciplining Gala for Improper Prescribing Practices are Supported by Substantial Evidence

We first address whether substantial evidence supports the violations the Board and

the Secretary found relating to Gala's improper prescribing practices. In reviewing the

record, the Superior Court found that substantial evidence exists to support the Board's

finding that Gala violated the following statutes and the Board's regulations. First, Gala

violated Section 1731(b)(2) by delivering controlled substances to a patient for other than

a therapeutic medical purpose. Second, in violation of Section 1731(b)(3), he engaged in

dishonorable or unethical conduct likely to deceive, defraud, or harm the public by failing

to follow the Board's regulations regarding the prescribing of controlled substances.[54]

Third, he used, distributed, or issued a prescription to the patient other than for a therapeutic

purpose in violation of Section 1731(b)(6). Fourth, his behavior over the four-month

period constituted a pattern of negligence in the practice of medicine in violation of Section

1731(b)(11). Fifth, because Section 1731(b)(17) provides that it may be a basis for

---

[54] *See also* Bd. Reg. 8.1.12 (defining 24 *Del. C.* § 1731(b)(3) to include noncompliance with the Board's regulations governing the use of controlled substances for the treatment of pain); Bd. Reg. 18.0 (containing the Board's regulations for the use of controlled substances for the treatment of pain).

22

professional discipline if a licensee of the Board violates a provision of the Medical Practice Act or a regulation of the Board where that violation more probably than not would harm or injure the public or an individual, the Board found that he violated that provision.

In addition, the Superior Court found that substantial evidence exists to support the Secretary's conclusions that Gala violated three statutes and the Secretary's Controlled Substance Regulations as follows. First Gala failed to maintain effective controls against the diversion of controlled substances in violation of Section 4735(b)(1). Second, he failed to comply with applicable law regarding the prescribing and dispensing of controlled substances in violation of Section 4735(b)(2). Third, in violation of Section 4735(b)(6), he failed to comply with the Secretary's Controlled Substance Regulations by violating the regulation requiring that every controlled substance prescription be for a legitimate medical purpose.[55]

The Superior Court was required to determine whether the Hearing Officer's decisions were supported by substantial evidence and free from legal error.[56] "Our standard of review 'mirrors that of the Superior Court.'"[57] "Where there is a review of an administrative decision by both an intermediate and a higher appellate court and the intermediate court received no evidence other than that presented to the administrative agency, the higher court does not review the decision of the intermediate court, but, instead,

---

[55] *See* Controlled Substance Reg. 4.2.1.

[56] *Prunckun*, 201 A.3d at 539.

[57] *Id*. (quoting *Stoltz Mgmt Co.*, 616 A.2d at 1208).

directly examines the decision of the agency."[58] Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. It is greater than a scintilla and less than a preponderance.[59] "This Court will not weigh the evidence, determine questions of credibility, or make its own factual findings."[60] Based upon our review of the record, we agree that each of the Board's and Secretary's findings and conclusions is supported by substantial evidence. We consider the violations and highlight some of the substantial evidence supporting each.[61]

Section 1731(b)(2) provides that it is unprofessional conduct for a licensed physician to engage in a crime substantially related to the practice of medicine.[62] Further, 16 *Del. C.* § 4754(a) makes it unlawful, except as authorized, for any person "to manufacture, deliver, or possess with the intent to manufacture or deliver a controlled substance."[63]

The Board's conclusion that Gala committed a crime substantially related to the practice of medicine through his improper distribution of controlled substances to S.G. is amply supported by substantial evidence. S.G. testified that on several occasions Gala

---

[58] *Id.*

[59] *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981) (quoting *Cross v. Califano*, 475 F. Supp. 896, 898 (M.D. Fla. 1979)).

[60] *Grossinger*, 224 A.3d at 959 (quoting *Jain v. Bd. of Nursing*, 72 A.3d 501, 2013 WL 3788095, at *3 (Del. July 16, 2013) (TABLE)).

[61] We note that much of the evidence overlaps and supports more than one violation. We will not identify each piece of supporting evidence for each violation as such an exercise is unnecessary and would be needlessly repetitious.

[62] 24 *Del. C.* § 1731(b)(2).

[63] 16 *Del. C.* § 4754(a).

provided her with a variety of prescription pills at his home from an unmarked pill bottle. When she asked about the source of the pills, Gala explained that he obtained the medication from patients who turned them in following the completion of their treatment. The Hearing Officer found "as a matter of fact that while Dr. Gala and S.G. were involved in unethical sexual activity in his home, he provided S.G. with multiple controlled substances," and that "[t]hose drugs were provided to her while he was not acting as a licensed drug 'dispenser,' and were provided to her outside the channel of a valid and lawful prescription."[64] Accordingly, citing to 16 *Del. C.* § 4754, he found that such activity would constitute a crime substantially related to the practice of medicine. The Hearing Officer also found by a preponderance of the evidence that Gala engaged in witness or victim intimidation in violation of 11 *Del. C.* § 3532[65] when he informed S.G. that her disclosures would result in "big trouble" for her. The record contains substantial evidence to support the Board's conclusion that Gala violated Section 1731(b)(2).

Board Regulation 8.1.12 states that a physician violates Section 1731(b)(3) if the physician fails to comply with Board regulations governing the use of controlled substances for the treatment of pain.[66] Board Regulation 18.0 establishes those procedures

---

[64] A340 (Recommendation to the Board).

[65] 11 *Del. C.* § 3532 deems it a Class D felony if a person "knowingly and with malice attempts to prevent another person who has been the victim of a crime, or a witness to a crime . . . from (1) making any report of such crime or victimization to any peace officer, law-enforcement officer, prosecuting agency. . . [or] (2) causing a complaint . . . to be sought or prosecuted, or from assisting in the prosecution thereof. . . ."

[66] Bd. Reg. 8.1.12.

25

and practices.[67]  From a review of the record, substantial evidence exists to support the Board's finding that Gala failed to comply with Board Regulations 8.1.12 and 18.0.  The Hearing Officer pointed to numerous deficiencies in Gala's care under those regulations. For example, Gala did not review S.G.'s prior medical records, establish a proper treatment plan, obtain informed consent from S.G., conduct periodic reviews of treatment protocols, or maintain proper medical records.   Further, regarding his prescribing Fentanyl, Gala admits that S.G.'s medical record contained no discussion of risks and benefits of additional opioids and no mention of additional treatment other than medication.  He admits that he did not request her prior treatment records.  The record adequately supports findings that Gala wrote her a prescription for Oxycodone in November 2016 for which there is no documented justification in her medical record, and that by late November 2016, S.G. was overusing her medication and showing signs of "aberrant drug-seeking behavior." Despite this, a week later, Gala wrote her a prescription for Dilaudid.   The record adequately supports findings that her record included no treatment note for that date, and that Gala wrote a December 20, 2016 prescription for Oxycodone without an office visit. The State's expert witness, Dr. Stephen Thomas, also testified that Gala's medical record keeping was sub-standard under the "Model Policy" and Board Regulation 18.0.

Section 1731(b)(6) permits the Board to discipline a physician who uses, distributes, or prescribes "a dangerous or narcotic drug, other than for therapeutic or diagnostic

---

[67] Bd. Reg. 18.0.

purposes."[68] Further, Section 4735(b)(6) permits the Secretary to discipline the holder of a CSR if the practitioner "[h]as violated . . . [a] rule of the Secretary related to controlled substances." The Secretary determined that Gala's prescribing practices violated Controlled Substance Reg. 4.2.1 which provides that a controlled substance prescription "must be issued for a legitimate medical purpose."[69]

Substantial evidence exists to support the Secretary's and the Board's findings that Gala prescribed S.G. opioids without a legitimate medical purpose. Dr. Thomas testified that Gala's decision to prescribe "opioids and only opioids" to a patient with a history of addiction and "clearly opioid non-responsive pain" was "medically nonsensical."[70] Further, Dr. Thomas testified that Gala's decision to increase S.G.'s dosage "in the absence of efficacy, outside the scope of the doctor/patient relationship with no documentation in the medical record" was not for "a medically legitimate purpose."[71] Accordingly, Dr. Thomas's testimony provides substantial evidence to support the Secretary and the Board's finding that Gala prescribed S.G. opioids without a legitimate medical purpose, in violation of Section 1731(b)(6) and Section 4735(b)(6).

Section 1731(b)(11) states that it is unprofessional conduct for a physician to commit "misconduct, including but not limited to. . . gross negligence or pattern of

---

[68] 24 *Del. C.* § 1731(b)(6).

[69] Controlled Substance Reg. 4.2.1.

[70] B19 (Excerpts from the Evidentiary Hearing).

[71] B23.

negligence in the practice of medicine."[72] The Board has established that pain management physicians must use reasonable care and diligence in the treatment of their patients.[73]

Substantial evidence exists to show that Gala engaged in a pattern of negligence when treating S.G. *First*, Dr. Thomas testified that it was grossly negligent for Gala to increase S.G.'s opioid dosage outside of the scope of the doctor/patient relationship without proper documentation in the medical record. *Second,* Gala admitted that he knew of S.G.'s history of addiction, yet elected to write her a prescription for opioids despite not having reviewed her previous treatment records. *Third,* Gala allowed S.G., who admitted to drug addiction, to retain an excess supply of Fentanyl patches. *Fourth,* Gala elected to write S.G. an additional opioid prescription seven days after S.G. admitted to overusing her medication. Dr. Thomas testified that the prescriptions written on November 30 were not for a valid documented purpose. When Gala added Dilaudid on November 20, S.G. had a six-day supply of Oxycodone remaining. Hence, he was essentially increasing her dosage again. Dr. Thomas characterized this as "gross negligence." In addition to his negligence regarding his medical treatment of S.G., Gala's sexual misconduct towards S.G., discussed below, constituted a pattern of negligence and gross negligence. As such, the record offers ample support to the Board's finding that Gala engaged in a pattern of gross negligence in his prescribing practices involving S.G.

---

[72] 24 *Del. C.* § 1731(b)(11).

[73] *See* Bd. Reg. 18.0 (establishing "specific requirements applicable to pain control, particularly related to the use of controlled substances" to be followed by pain management physicians practicing medicine in the state of Delaware).

The Secretary's finding that Gala failed to maintain effective controls against the diversion of controlled substances is supported by substantial evidence. Section 4735(b)(1) states that the Secretary may impose discipline upon any individual who possesses a CSR if the practitioner "has failed to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific or industrial channels."[74]

S.G. signed a "pain management contract" with Gala during her initial appointment.[75] S.G. testified that she and Gala did not discuss the contents of the agreement.[76] The contract states that S.G. would be subject to a variety of tests, protocols, and screenings, to ensure that S.G. was not abusing her prescriptions.[77] Yet the record illustrates that Gala did not enforce the terms as S.G. never participated in a pill count, Gala did not review the results of S.G's drug screening prior to prescribing her additional opioids,[78] and Gala did not discuss the results of a drug screening that revealed that S.G. tested positive for a controlled substance that Gala did not prescribe.[79] While Gala and S.G. engaged in sexual activities in his home, Gala dispensed to S.G. certain quantities of unprescribed controlled substances. Thus, Gala failed to maintain effective controls against diversion by S.G. of prescribed medications. Substantial evidence exists to support

---

[74] 16 *Del. C.* § 4735(b)(1).

[75] Am. Opening Br. Tab B, at 2 (Secretary's Final Order).

[76] A252 (Recommendation to the Board).

[77] *Id.*; A126–27 (S.G. Medical Records).

[78] A288 (Recommendation to the Board).

[79] A469–70 (Recommendation to the Committee).

the Secretary's finding that Gala violated Section 4735(b)(1).

Section 4735(b)(2) provides that the Secretary may discipline any individual that possesses a CSR if the practitioner fails to comply with applicable federal, state, or local law.[80] The Secretary's finding that Gala's prescribing practices were inconsistent with applicable law is supported by substantial evidence.

Gala's prescribing practices violated a multitude of state and local laws. As discussed above, the Board found that Gala violated Board Regulations 8.1.12 and 18.0 and Section 1731(b)(2), (3), (6), and (11). In view of the foregoing, the Hearing Officer's finding of a violation of Section 1731(b)(17) is supported by substantial evidence.[81] Accordingly, because the Board was able to meet the substantial evidence threshold for proving these violations, substantial evidence exists to support the Secretary's finding that Gala violated Section 4735(b)(2) as well.

> b. *The Board's and the Secretary's Conclusion that Gala's Relationship Was Improper is Supported by Substantial Evidence*

Next, we examine the substantial evidence supporting the Board's and the Secretary's findings that Gala's sexual relationship was improper and subject to discipline.

As a preliminary matter, in his Opening Brief, Gala does not admit to having a

---

[80] 16 *Del. C.* § 4735(b)(2).

[81] Am. Opening Br. Tab A, at 3–7 (Board's Final Order) (enumerating and adopting in part the violations the hearing officer recommended the Board identify); *see also* Bd. Regs. 8.1.12, 18.0 ("Failure to comply with the [Board's] regulations governing the use of controlled substances for the treatment of pain" and "Model Policy for the Use of Controlled Substances for the Treatment of Pain").

sexual relationship with S.G.[82]  In his testimony before the Hearing Officer, he denied any

sexual relationship with S.G.[83]  Yet the Hearing Officer's findings of a sexual relationship

were supported by substantial evidence.  For example, the Hearing Officer found that:

> After a professional physician-patient relationship had been established between the two, Dr. Gala asked to meet S.G. in a Royal Farms parking lot. She entered Dr. Gala's car.  At his request, S.G. performed oral sex on Dr. Gala as he drove.  I find that this event has been proven by a preponderance of the evidence.  I found S.G.'s testimony on the point credible and her claim is corroborated by the fact that her cell phone was subsequently found in his car.[84]

The Hearing Officer found other facts by a preponderance of the evidence, including

S.G.'s agreement to participate "in some form of ménage a trois."[85]  He found

corroboration of this when one of Gala's co-workers testified that Gala admitted to her that

---

[82] Am. Opening Br. at 25.  Yet when asked that question directly by the Superior Court, Gala's counsel's response was less than clear:

> [THE COURT]:  And, specifically, it appeared to me that he was denying that there was a sexual relationship with the patient at the hearing officer level, but now on appeal he's admitting to that.  Am I reading that correctly, sir?

> [COUNSEL]:  No.  I think that we probably wrote the briefs in a fashion that intimated that he was accepting that.  Doctor Gala does not admit, he's never admitted that he's ever had an improper sexual relationship with this patient.  I think that what you're seeing in the briefs that we submitted is coming from the notion that we're stuck with certain facts. . . .

A552 (Excerpt of Proceedings Before the Superior Court).  The Superior Court apparently understood this to mean that Gala was not denying a sexual relationship, stating in its opinion that, "[a]t first Dr. Gala denied any sexual relationship with the patient, but now admits that there was a sexual relationship but that it was consensual."  *Gala*, 2020 WL 2111372, at *8.

[83] A292 (Recommendation to the Board).

[84] A332.

[85] A335.

"he had hosted 'two prostitutes' in his home and they all engaged in a 'threesome.'"[86] The next day, Gala wrote a personal check to S.G. for $440, purportedly for "housekeeping." Another co-worker testified similarly.[87] S.G. testified that she had a sexual relationship with Gala and "hung out" with him at his house.

Substantial evidence exists to support the Board's finding that Gala's relationship with S.G. violated Section 1731(b)(1). Section 1731(b)(1) states that it is unprofessional conduct for a physician to engage in unethical conduct in connection with the practice of medicine. As the Hearing Officer found, Gala was exchanging off-prescription opioid painkillers for sexual favors with a patient he knew to be addicted. The record supports the Hearing Officer's conclusions that Gala entered into an abusive sexual relationship with S.G. who was at high risk, vulnerable, and dependent on Gala for an uninterrupted supply of controlled substances as well as other controlled substances which he dispensed to her in his home without a prescription. S.G. testified that Gala forced her to continue taking opioid drugs rather than return to Suboxone therapy in an attempt to cease opioid abuse, threatening her with cessation of care entirely. She testified that on more than one occasion she feared that refusing Gala's advances or demands for sexual favors would result in termination of their relationship and access to controlled substances prescriptions. She testified further that, while engaged in sexual misconduct at his home, Gala would give her non-prescribed drugs which rendered her more pliant. The Hearing Officer found her to

---

[86] *Id.*

[87] B60–61 (Excerpts from the Evidentiary Hearing).

be credible.

Further, Dr. Thomas testified that such a relationship was "exceedingly" ethically improper because of the asymmetric power relationship between a doctor and the patient. Gala's argument that S.G. was an "able, active, and willing participant" in the relationship is contrary to Dr. Thomas's expert opinion testimony about ethical and moral standards of the medical profession. That expert opinion provides substantial evidentiary support to the Board's finding that Gala's relationship with S.G. violated Section 1731(b)(1).

Board Regulation 8.1.2 states that a practitioner violates Section 1731(b)(3) by "exploitation of the doctor/patient privilege for personal gain or sexual gratification."[88] Additionally, Board Regulation 8.1.3 provides that a practitioner violates Section 1731(b)(3) by engaging in "sexual impropriety," which includes "sexually suggestive behavior, gestures, expressions, statements and failure to respect a patient's privacy."[89] Substantial evidence exists to support the Board's conclusion that Gala violated Section 1731(b)(3) by exploiting the doctor/patient privilege for sexual gratification and for engaging in sexual impropriety.

Section 1731(b)(3) also states that it is unprofessional conduct for a physician to engage in any "dishonorable, unethical, or other conduct likely to *deceive, defraud, or harm the public*."[90] The Board's decision that Gala violated this statute is supported by substantial evidence in the record, both as to Gala's improper prescribing practices towards

---

[88] Bd. Reg. 8.1.2.

[89] Bd. Reg. 8.1.3.

[90] 24 *Del. C.* § 1731(b)(3) (emphasis added).

S.G., and his improper sexual relationship with her. As the Board explained, "the power dynamic between a patient with an admitted substance abuse problem and a doctor who is willing to write prescriptions for controlled substances without adherence to this Board's Regulation 18 regarding the keeping of records makes Gala's exception that S.G. was a consenting party ring hollow."[91] Gala held immense power over S.G., and the record contains evidence adequate to support the Board's and Secretary's conclusions that Gala abused that power to control S.G. in a coercive sexual relationship.

During the evidentiary hearing, Dr. Thomas testified that a sexual relationship between a physician and a patient is unethical.[92] Dr. Thomas explained that such a relationship is improper because of the "asymmetric power position between the physician and the patient."[93] Dr. Thomas elaborated that the power dynamic becomes more skewed in favor of the physician when the patient is relying upon the physician to provide them with controlled substances to satisfy an addiction. Dr. Thomas stated that such an arrangement leaves the patient in a "debilitative circumstance."[94] He testified that "[t]he introduction of sex in exchange for such prescriptions" is "exceedingly unethical and unsupportable by any means."[95]

---

[91] Opening Br. Tab A, at 6 (Final Board Order).

[92] B23–24 (Excerpts from the Evidentiary Hearing).

[93] B23.

[94] B24.

[95] *Id.*

The record shows that the power disparity affected S.G. and Gala's relationship on at least three separate occasions. *First*, S.G. testified that she believed that if she refused to "hang out" with Gala that he would stop prescribing for her, and that she may lose her job. *Second,* Gala was only able to secure S.G.'s participation in a group sex activity after agreeing to pay for her opioid prescription. *Third,* Gala refused to treat S.G. and put her back on Suboxone after she requested to end the relationship with Gala. As such, these instances illustrate Gala's abuse of his power in the relationship by using S.G.'s addiction and his ability to prescribe her medications as a means to exercise influence and control over her. The record supports the finding of a violation of Section 1731(b)(3).

The Secretary's finding that Gala's relationship with S.G. was inconsistent with the public's interest is supported by substantial evidence. Section 4735(b)(8) states that the Secretary may discipline the holder of a CSR if the practitioner engages in conduct that the Secretary deems to be "relevant and inconsistent with the public interest."[96]

Citing some of the evidence referred to above, the Secretary found that "Gala's inappropriate prescribing was repeated and egregious."[97] Because Gala "knew that, as an addict, S.G. would do whatever he required in order to obtain controlled substances" and "abused his authority as a registrant in connection with his relationship with S.G.," the Secretary concluded that "[i]n order to protect Dr. Gala's other patients and the public interest, it is necessary to remove Dr. Gala's authority to prescribe controlled substances

---

[96] 16 *Del. C.* § 4735(b)(8).

[97] Am. Opening Br. Tab B, at 4 (Secretary's Final Order).

by revoking his CSR."[98]  The record supports the Secretary's conclusions.  As discussed above, Gala engaged in an abusive and unethical sexual relationship with S.G.  Gala was aware of S.G.'s prior issues with substance abuse, and Gala's election to exploit his CSR to exchange prescriptions for sex with S.G. illustrates the influence and power that Gala's improper use of his CSR gave him over S.G.

## IV.    Conclusion

For the foregoing reasons, the Board's and Secretary's decisions revoking Gala's medical license and CSR are both supported by substantial evidence and free from legal error.  The Delaware Superior Court's judgment upholding those decisions is AFFIRMED.

---

[98] *Id.* at 4–5.